[Cite as *State v. Johnson*, 2011-Ohio-3623.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

STATE OF OHIO

    Appellee

    v.

BRIAN JOHNSON

    Appellant

C.A. No.     09CA0054-M

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF MEDINA, OHIO
CASE No.    08 CR 0282

DECISION AND JOURNAL ENTRY

Dated: July 25, 2011

---

DICKINSON, Presiding Judge.

INTRODUCTION

{¶1} Brian and Carol Johnson took their seven-week-old son N.J. to the emergency room because his left arm looked broken. X-rays revealed that N.J. not only had a displaced humerus, but twelve other fractures at various stages of healing. The Grand Jury indicted Mr. Johnson, who was N.J.'s primary caregiver, on three counts of felonious assault and five counts of child endangering. Although Mr. Johnson presented evidence that N.J.'s bones may have been more fragile than normal because of a Vitamin D deficiency, a jury convicted him of two counts of felonious assault and all five counts of child endangering. The trial court sentenced him to 20 years in prison. He has appealed, arguing that the jury's verdict forms were insufficient to convict him of elevated offense levels, that the prosecutor committed misconduct, that his trial lawyers were ineffective, that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence, that the jury's verdicts are

inconsistent, and that he was incorrectly convicted multiple times for the same conduct. We affirm in part because, although the prosecutor repeatedly engaged in improper conduct, we cannot say his improper conduct deprived Mr. Johnson of a fair trial and Mr. Johnson's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. We vacate Mr. Johnson's sentence because the jury's verdicts were not sufficient to convict him of elevated offense levels of child endangering and because the trial court may have sentenced him on allied offenses.

## FACTS

{¶2} The Johnsons met on an internet dating site while Mr. Johnson was living in Pennsylvania. He eventually moved to Ohio and married Mrs. Johnson. In April 2008, Mrs. Johnson gave birth to N.J. She returned to work in late May. Mr. Johnson, who had been unable to find a job in Ohio, stayed home to care for N.J.

{¶3} In the weeks after N.J. was born, many of the Johnsons' friends and family members came to see him. None of them noticed anything wrong with N.J. Dr. William Oehlenschlager, N.J.'s pediatrician, administered a couple of well-care child examinations, including one on May 30, 2008, which did not reveal anything unusual. On June 6, 2008, however, the Johnsons took N.J. to the emergency room of the Wadsworth-Rittman hospital because his left arm was hanging funny. According to Dr. Jay Carter, the emergency room physician who examined N.J. that day, his heart skipped a beat when he saw N.J. because he was so young and had such a badly deformed arm. Dr. Carter described the fracture to N.J.'s humerus as very unusual for someone N.J.'s age.

{¶4} As Dr. Carter examined N.J., he noticed that, in addition to the broken arm, he had bruises on his forehead and back and an abrasion on his nose. The bruise on the forehead

appeared to be several days old. According to Dr. Carter, the Johnsons told him that N.J. had been injured in a fall a couple of days earlier. Although he decided to transfer N.J. to Akron Children's Hospital for treatment, Dr. Carter took a full-body x-ray of N.J., called a babygram, before an internal mobile critical care unit team took him to Children's.

{¶5} When N.J. arrived at Children's, the emergency room physicians there ordered a complete skeletal survey, a series of x-rays of all of N.J.'s bones. Meanwhile, Dr. Richard Skoblar, a radiologist at the Wadsworth-Rittman hospital, examined the babygram and discovered that, not only was N.J.'s left humerus broken, but also his right humerus and several other bones. Mr. Johnson told Dr. R. Daryl Steiner, a pediatrician at Children's, that he was carrying N.J. downstairs on June 4 when he slipped and lost hold of N.J., who fell down the stairs onto the landing. Because N.J. did not have any sign of serious injury, he and Mrs. Johnson did not take him to the hospital. When Mrs. Johnson got home from work on June 6, however, she went to N.J.'s bedside and noticed that his arm was limp and deformed, which was the reason they took him to the emergency room that day.

{¶6} Dr. Steiner examined the skeletal survey and discovered that N.J. had a total of 13 fractures of his arms, legs, ribs, and skull, some of which were about two weeks old based on the new bone that was forming. He determined that there had been at least three events that caused N.J.'s fractures, one about two weeks before, one a couple of days before, and one that same day. Dr. Steiner, who is the director of Children's child abuse evaluation clinic, testified that, in his experience, N.J.'s humerus would have displaced immediately after he was injured.

{¶7} According to Dr. Steiner, N.J.'s injuries were consistent with child abuse, but other possible causes had to be ruled out before concluding they were caused by child abuse. He tested N.J. for osteogenesis imperfecta, otherwise known as brittle bone disease, and

hyperparathyroidism, but determined that N.J. did not have either of those conditions. Another test showed that N.J. had a vitamin D deficiency, but, according to Dr. Steiner, he had enough vitamin D for normal bone growth and did not have any signs of rickets, which is the disease that vitamin D deficiency causes.

{¶8} Dr. Paul Fleissner, a pediatric orthopedic surgeon, also consulted on N.J.'s care. According to Dr. Fleissner, N.J.'s vitamin D level was low, but not low enough to explain his fractures. It was "[e]xtremely obvious" to Dr. Fleissner that N.J.'s fractures were the result of child abuse. Dr. Fleissner and Dr. Steiner noted that, after N.J. was removed from the Johnsons' care, he didn't have any new fractures.

{¶9} The doctors at Children's contacted police regarding N.J.'s injuries. Daniel Boyd, a detective for the City of Wadsworth, responded to the hospital and interviewed the Johnsons separately. The Johnsons told him consistent stories about N.J.'s fall down the stairs. When the detective asked them about N.J.'s older injuries, they told him that, about three weeks earlier, Mrs. Johnson had laid N.J. down on a couch while she was doing laundry and that, after she left the room, they heard a thump. When they ran into the room, they discovered N.J. lying on the floor.

{¶10} The Grand Jury indicted Mr. Johnson on three counts of felonious assault: one for May 23 through May 30, 2008; one for May 31 through June 6, 2008; and one for June 6, 2008. It also indicted him on five counts of child endangering: two for May 23 through May 30, 2008; one for May 31 through June 5, 2008; one for May 31 through June 6, 2008; and one for June 6, 2008. The Grand Jury indicted Mrs. Johnson on two counts of child endangering for the time period of May 23 through May 30, 2008.

{¶11} The Johnsons' cases were tried together to a jury. After the State finished presenting its case, however, it dismissed one of the counts against Mrs. Johnson and the trial court granted her motion for judgment of acquittal on the other. Mr. Johnson testified in his own defense and presented evidence that his and Mrs. Johnson's families have a history of vitamin D deficiencies and other skeletal problems such as osteoporosis and scoliosis. He also presented testimony from a pediatric orthopedic surgeon that, even though N.J. does not have brittle bone disease, he did have a vitamin D deficiency that, combined with his family history, could have resulted in abnormal bones that fractured under normal pressure. The jury, however, convicted Mr. Johnson of every offense except felonious assault on or about May 23 through May 30, 2008. Mr. Johnson has appealed, assigning seven errors.

## INSUFFICIENT VERDICT FORMS

{¶12} Mr. Johnson's first assignment of error is that his sentence violates Section 2945.75(A)(2) of the Ohio Revised Code because the jury verdict forms neither stated the degree of the offense he was found guilty of committing nor delineated any elements that would have elevated the level of the offenses. Under Section 2945.75(A)(2), "[w]hen the presence of one or more additional elements makes an offense one of more serious degree . . . [a] guilty verdict shall state either the degree of the offense of which the offender is found guilty, or that such additional element or elements are present. Otherwise, a guilty verdict constitutes a finding of guilty of the least degree of the offense charged."

{¶13} Regarding Mr. Johnson's convictions for child endangering under Section 2919.22(A) and (B)(1) of the Ohio Revised Code, subsection 2919.22(E)(2)(a) provides that, "[e]xcept as otherwise provided . . . [in] this section, [child endangering is] a misdemeanor of the first degree[.]" If the violation resulted in serious physical harm to the child, a violation of

Section 2919.22(A) is a felony of the third degree and a violation of Section 2919.22(B)(1) is a felony of the second degree. R.C. 2919.22(E)(2)(c), (d).

{¶14} In the indictment, the State alleged that Mr. Johnson's conduct resulted in serious physical harm to N.J. The jury's verdict forms, however, did not state the offense level or include a finding that he had caused serious physical harm. Mr. Johnson has argued that the trial court, therefore, incorrectly determined that his convictions for child endangering were felonies instead of misdemeanors of the first degree.

{¶15} In *State v. Pelfrey*, 112 Ohio St. 3d 422, 2007-Ohio-256, the Ohio Supreme Court determined that the language of Section 2945.75(A)(2) is clear, holding that "a verdict form signed by a jury must include either the degree of the offense of which the defendant is convicted or a statement that an aggravating element has been found to justify convicting a defendant of a greater degree of a criminal offense." *Id*. at ¶14. It concluded that, because the verdict form in that case did not comply with Section 2945.75(A)(2), the trial court had to convict Mr. Pelfrey of the least degree of the offense charged, even though "the evidence overwhelmingly show[ed] the presence of the aggravating element, the jury verdict form incorporate[d] the indictment[,] and [Mr. Pelfrey] never raised the inadequacy of the jury verdict form at trial." *Id*. at ¶1.

{¶16} The State has argued that this Court should not apply Section 2945.75(A)(2) because Mr. Johnson did not object to the verdict form, did not request an instruction on a lesser-included offense, and has never denied that N.J. suffered serious physical harm. Its arguments are similar to those rejected by the Supreme Court in *Pelfrey*. *State v. Pelfrey*, 112 Ohio St. 3d 422, 2007-Ohio-256, at ¶1. The State has also argued that Section 2945.75(A)(2) only applies to cases in which there are inferior degrees of the offense in the indicted statute, but it has failed to demonstrate that a conviction under Section 2919.22(A) or (B)(1) does not qualify. Finally, it

has suggested that *Pelfrey* was incorrectly decided, but we have no authority to not follow the Ohio Supreme Court.

{¶17} We conclude that Section 2945.75(A)(2) applies to Mr. Johnson's child endangering convictions. Because the jury's verdict forms do not satisfy Section 2945.75(A)(2), Mr. Johnson could only be convicted of the least degree of those offenses, misdemeanors of the first degree. As to Mr. Johnson's convictions for child endangering, his first assignment of error is sustained.

{¶18} Regarding Mr. Johnson's convictions for felonious assault, under Section 2903.11(D)(1)(a) of the Ohio Revised Code, felonious assault is a felony of the second degree unless committed against a law enforcement officer; then it is a felony of the first degree. The trial court determined that Mr. Johnson's convictions for felonious assault were felonies of the second degree. Because Mr. Johnson was convicted of the least degree of felonious assault, the fact that the jury's verdict forms do not indicate the degree of the offense or an aggravating factor is immaterial. As to Mr. Johnson's convictions for felonious assault, his first assignment of error is overruled.

## SUFFICIENCY

{¶19} The first part of Mr. Johnson's fourth assignment of error is that his convictions are not supported by sufficient evidence. Whether a conviction is supported by sufficient evidence is a question of law that this Court reviews de novo. *State v. Thompkins*, 78 Ohio St. 3d 380, 386 (1997); *State v. West*, 9th Dist. No. 04CA008554, 2005-Ohio-990, at ¶33. We must determine whether, viewing the evidence in a light most favorable to the prosecution, it could have convinced the average finder of fact of his guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d 259, paragraph two of the syllabus (1991).

FELONIOUS ASSAULT

{¶20} The jury convicted Mr. Johnson of two counts of felonious assault. Under Section 2903.11(A)(1) of the Ohio Revised Code, "[n]o person shall knowingly . . . [c]ause serious physical harm to another . . . ." "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶21} In one of the felonious assault counts, the State alleged that Mr. Johnson knowingly caused serious physical harm to N.J. "on or about May 31, 2008, through June 6, 2008[.]" In the other, it alleged that he knowingly caused serious physical harm to N.J. "on or about June 6, 2008[.]" Although the State did not present any direct evidence that Mr. Johnson injured N.J., it presented sufficient circumstantial evidence to support his convictions. "Circumstantial evidence and direct evidence inherently possess the same probative value . . . ." *State v. Jenks*, 61 Ohio St. 3d 259, paragraph one of the syllabus (1991).

{¶22} The State presented evidence that N.J. suffered at least three events that caused his fractures. Dr. Fleissner testified that, although some of the fractures were already well healed by June 6, 2008, the ones to his legs and arms were less than a week old. Dr. Fleissner testified that it would have taken a significant amount of force to cause the fractures, that he had diagnosed instances of child abuse in the past, and that it was "[e]xtremely obvious" to him that N.J.'s fractures were the result of child abuse. He also testified that N.J.'s humerus would not have broken one day but displaced a couple of days later unless a new force was applied to it. According to him, early in life, bones are covered by a thick lining called the periosteum. The lining is like a piece of leather covering the bones that provides stability. Dr. Fleissner testified

that, "[u]nless there was another injury, if [the bone] was nondisplaced to start with, it would stay that way." "Because [of] the periosteum in a young child of that age, fractures do not move. It's almost like having internal splints."

{¶23} Dr. Steiner also testified that N.J. suffered at least three episodes of trauma: one about two weeks before the Johnsons took him to the emergency room, another a couple of days before the hospital visit, and the event that caused N.J.'s arm to deform. Dr. Steiner agreed with Dr. Fleissner that the deformity would have been apparent on the day it happened. According to Dr. Steiner, "[i]t would not have been normal for two days and then suddenly made its appearance on Friday at noon." In his experience, "[w]hen a child breaks a bone, they are immediately symptomatic, and that fracture is displaced with the force of the injury, not with any other intrinsic force . . . ." Dr. Steiner testified that "the incongruity of the injuries that we saw, with the history that was told, led me to conclude that there was a high possibility . . . that [N.J.] was the victim of abuse injury on at least multiple occasions."

{¶24} According to Detective Boyd, Mrs. Johnson told him that, on June 6, 2008, she went to work for half a day. When she got home, she discovered that N.J.'s left arm did not appear to be hanging right and that, when she and Mr. Johnson attempted to touch the arm, it caused N.J. to scream. Mr. Johnson admitted that he was the only one with N.J. before Mrs. Johnson discovered that there was something wrong with his arm.

{¶25} Based on the evidence that N.J. suffered multiple broken bones during the week before he was taken to the emergency room, that Mr. Johnson was N.J.'s primary caregiver and was the only person with N.J. at the time his humerus displaced, that it would have taken a significant amount of force to break N.J.'s bones, and that N.J. did not suffer any new fractures after being removed from the Johnsons' care, the jury could have inferred that Mr. Johnson

knowingly caused serious physical harm to N.J. during the period of May 31 to June 6, 2008, and on June 6, 2008. To the extent that Mr. Johnson's fourth assignment of error is that his felonious assault convictions are not supported by sufficient evidence, it is overruled.

CHILD ENDANGERING

{¶26} The jury also convicted Mr. Johnson of five counts of child endangering under Section 2919.22(A) and (B)(1) of the Ohio Revised Code. Under Section 2919.22(A), "[n]o person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age . . . shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." Under Section 2919.22(B)(1), "[n]o person shall do any of the following to a child under eighteen years of age . . . [a]buse the child." Under Section 2901.21(B), if a crime "neither specifies culpability nor plainly indicates a purpose to impose strict liability, recklessness is sufficient culpability to commit the offense." "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C).

{¶27} The evidence that supports Mr. Johnson's convictions for felonious assault also supports his convictions for child endangering under Section 2919.22(A) and (B)(1) for those same time periods. Regarding his convictions for the period of May 23 through May 30, 2008, there was testimony from Dr. Fleissner and Dr. Steiner that some of N.J.'s fractures occurred about two weeks before they examined him. May 23, 2008, was exactly two weeks before the date the Johnsons took N.J. to the emergency room. The jury could have reasonably inferred that Mr. Johnson caused the earlier injuries. To the extent that Mr. Johnson's fourth assignment of

error is that his child endangering convictions are not supported by sufficient evidence, it is overruled.

MANIFEST WEIGHT

{¶28} The second part of Mr. Johnson's fourth assignment of error is that his convictions are against the manifest weight of the evidence. When a defendant argues that his convictions are against the manifest weight of the evidence, this Court "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction[s] must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App. 3d 339, 340 (1986).

{¶29} Mr. Johnson has noted that the State's doctors testified that, before they can make a diagnosis of child abuse, they must rule out underlying bone disorders. He has argued that N.J.'s doctors failed to rule out an underlying bone disorder, noting that, although Dr. Fleissner testified that some of the things they would look at are calcium, phosphate, and parathyroid levels, none of N.J.'s doctors ordered a calcium, alkaline phosphatase, or parathyroid hormone test while he was in the hospital. He has also argued that N.J.'s doctors did not sufficiently investigate N.J.'s family medical history before reaching their conclusions.

{¶30} Dr. Fleissner testified that he did not order a calcium test because, looking at N.J.'s x-rays, there was no indication that they should be concerned about his calcium level. He also testified that N.J.'s calcium, phosphate, and parathyroid levels were tested in April 2009 and were normal. He further testified that, even though that testing was done almost a year later, the results would not have changed from June 2008. Dr. Cathleen Raggio, the pediatric orthopedic surgeon Mr. Johnson called as an expert, did not offer an opinion about whether N.J.'s calcium,

phosphate, and parathyroid levels would have changed significantly from June 2008 to April 2009.

{¶31} Regarding N.J.'s family medical history, Dr. Raggio testified that Mr. Johnson has hyperparathyroidism, vitamin D deficiency, osteopenia, scoliosis, bowed legs, and dental problems. Mrs. Johnson has hyperparathyroidism and vitamin D deficiency. Other members of N.J.'s extended family have vitamin D deficiency, hyperparathyroidism, secondary hyperparathyroidism, osteopenia, degenerative disc disease, and dental problems. Dr. Steiner, however, noted that, despite those conditions, none of N.J.'s family members had had an unusual number of fractures. According to Dr. Steiner, Mr. Johnson told him "that he had suffered fractures of the hand or fingers in an athletic-related event as an adolescent, but otherwise there was no family history of bone disease . . . ." The jury was entitled to consider that, even though N.J.'s family members had a number of disorders, no one else had experienced a similar rate of fracture. Furthermore, the only underlying condition that N.J. had was vitamin D deficiency. The jury was entitled to believe Dr. Fleissner's and Dr. Steiner's testimony that vitamin D deficiency alone is insufficient to cause bone fragility.

{¶32} Mr. Johnson has also argued that, even if N.J.'s injuries were intentionally inflicted, it is equally as likely that Mrs. Johnson was the one who inflicted them. Mr. Johnson's argument is inconsistent with his testimony at trial, which was that N.J.'s injuries were the result of his rolling off the couch and an accidental fall down the stairs. In addition, the evidence established that, after Mrs. Johnson returned to work at the end of May, Mr. Johnson had more access to N.J. than did Mrs. Johnson. Mr. Johnson also admitted that he was the only one with N.J. the morning before Mrs. Johnson discovered that his arm was deformed.

{¶33} Furthermore, there were gaps in Mr. Johnson's testimony that undermined his credibility. See *State v. Johnson*, 46 Ohio St. 3d 96, 100 (1989) (noting that lying is a "circumstance tending to show consciousness of guilt."). According to Mr. Johnson, Mrs. Johnson got home from work on June 6, 2008, between 12:30 and 12:45 p.m. They talked for about fifteen minutes, and then she checked on N.J. She picked him up and walked around for another fifteen minutes while they continued talking and only then discovered that there was something wrong with his arm. Mr. Johnson testified that they decided to go to the hospital right away, but that he took three minutes to rinse his hair in the shower before they left. According to Mr. Johnson, they were out of the house about ten minutes after discovering N.J.'s injury and it took them only about fifteen minutes to drive to the hospital. Based on Mr. Johnson's timeline, even if it took him five minutes to rinse his hair, the Johnsons would have arrived at the hospital at 1:35 p.m. Their actual time of arrival was about an hour later. Mr. Johnson did not offer an explanation for this inconsistency.

{¶34} The jury may also have found that Mr. Johnson's explanation for how N.J. could have suffered the two-week-old fractures incredible. According to Mr. Johnson, there was an incident around that time in which Mrs. Johnson placed N.J. diagonally on a couch then left the room. He was upstairs, but ran downstairs when he heard a thump. Mrs. Johnson and he entered the room around the same time and discovered N.J. lying on the floor. At the time, N.J. would have only been four or five weeks old, and the jury may not have believed that a baby of that age could roll over by himself or that, even if N.J. could have rolled off of the couch onto the carpeted floor, that Mr. Johnson would have heard a thump from upstairs.

{¶35} Finally, the jury may not have believed Mr. Johnson's story about falling down the stairs. According to Mr. Johnson, he was about four or five steps down the stairs when he

slipped and lost control of N.J. He testified that, because he is nimble, he was able to regain his balance and jump to the bottom of the staircase, taking care to avoid landing on his son. The prosecutor pointed out that, if "you slip, it would seem to me that you go backwards . . . as opposed to trip[ping]." Although Mr. Johnson demonstrated how he thought it had happened, the jury may have agreed with the prosecutor that, if Mr. Johnson slipped, N.J. would have fallen backwards with him, instead of flying forward down the staircase.

{¶36} We have reviewed the record and conclude that the jury did not lose its way when it convicted Mr. Johnson of child endangering and felonious assault. To the extent Mr. Johnson's fourth assignment of error is that his convictions are against the manifest weight of the evidence, it is overruled.

MISTRIAL

{¶37} Mr. Johnson's fifth assignment of error is that the trial court incorrectly denied his motion for mistrial after it dismissed his wife as a co-defendant. He has argued that he was "enormously prejudiced" by the dismissal of his wife because it sent a message to the jury that something had been decided and allowed the jury to speculate that the trial court had decided that Mrs. Johnson did not do it, but he did. He has also argued that he could not have predicted that the State would dismiss one of the counts against his wife mid-trial and that it would not present any evidence on the other charge, resulting in a judgment of acquittal.

{¶38} "When considering a motion for mistrial, the trial court must determine whether the substantial rights of the accused have been adversely affected." *State v. Vandyke*, 9th Dist. No. 05CA008723, 2007-Ohio-1356, at ¶10. "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St. 3d 118, 127 (1991).

{¶39} After the charges against Mrs. Johnson were dismissed, the trial court instructed the jury "not to speculate or presume anything" and "to draw no inference whatsoever from the fact" that Mrs. Johnson was no longer a defendant. "A jury is presumed to follow the instructions of the trial court, including curative instructions." *Rivera v. Lake Terminal R.R. Co.*, 132 Ohio App. 3d 483, 487 (1999). The trial court asked the jurors if they understood the instruction and satisfied itself that they did. We conclude that Mr. Johnson has failed to establish that the dismissal of the charges against Mrs. Johnson deprived him of a fair trial. His fifth assignment of error is overruled.

INCONSISTENT VERDICTS

{¶40} Mr. Johnson's sixth assignment of error is that his acquittal on the felonious assault charge for May 23 to May 30, 2008, but conviction of child endangering for that same period indicates that the jury was confused. According to Mr. Johnson, because the trial court renumbered the counts to group like counts together and the verdict forms did not contain the applicable dates for each charge, it is likely that the jury confused some of them. He has, therefore, argued that his conviction of child endangering under Section 2919.22(B)(1) for May 23 to May 30, 2008, should be reversed.

{¶41} The Ohio Supreme Court has held that "inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count." *State v. Lovejoy*, 79 Ohio St. 3d 440, paragraph one of the syllabus (1997); see *United States v. Powell*, 469 U.S. 57, 65 (1984) ("inconsistent verdicts . . . should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the [convicted] offense, and

then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the [acquitted] offense."). Mr. Johnson's sixth assignment of error is overruled.

## PROSECUTORIAL MISCONDUCT

{¶42} Mr. Johnson's second assignment of error is that the prosecutor engaged in a pattern of improper conduct that deprived him of a fair trial. His third assignment of error is that, to the extent his trial lawyers did not object to the prosecutor's improper conduct, they were ineffective.

{¶43} The prosecutor in this case did engage in a pattern of improper conduct. That fact alone, however, does not amount to "prosecutorial misconduct" that will lead to a reversal. Rather, before an Ohio court can reverse a defendant's convictions based on a prosecutor's improper conduct, it must determine that the defendant was deprived of a fair trial. *State v. Fears*, 86 Ohio St. 3d 329, 332 (1999). That is an extremely close question in this case. Before we get to it, however, we will review some of the prosecutor's improper conduct.

### Cross-examination of Defense Witnesses

{¶44} Mr. Johnson has argued that the prosecutor committed numerous instances of improper conduct during his cross-examination of defense witnesses. An embarrassing amount of that cross-examination reads more like the script of a television drama than the type of cross-examination that is expected from a prosecutor.

### The Church Women

{¶45} Three women from the Johnsons' church testified that they and a fourth woman from the church visited the Johnsons at their home on May 21, 2008, after having attended choir practice. They all testified that N.J. seemed fine that evening. They also testified that, when they had initially been asked about the date of their visit, they mistakenly said it was on May 28,

but later recognized their mistake after one of them, Janet Weant, found a 2008 calendar on which she had noted the actual date of their visit. The fourth woman was out of the country at the time of the trial and did not testify. Mr. Johnson's lawyers had apparently taken her deposition, but did not offer it at trial.

{¶46} During his cross-examination of the three women who did testify at trial, the prosecutor questioned them extensively about how they came to change their belief about the date of their visit. Their original belief that they had visited on the 28th, nine days before the Johnsons took N.J. to the emergency room on June 6, would have been more helpful to the Johnsons' defense than their testimony that they had actually visited on the 21st, sixteen days before the emergency room visit. That cross-examination included numerous improper references to what the fourth woman, Julie Vandersommers, supposedly testified at her deposition. During his cross-examination of Maryann Toney, for example, the prosecutor repeatedly asked questions framed to improperly put before the jury what Ms. Vandersommers supposedly testified:

"Q      And you're aware that Julie – I think Vandersommers – has previously testified in this case?

A      Yes.

Q      And you've talked about that with people?

A      I have not.

Q      How do you know she testified then?

A      We talked with the lawyers.

. . . .

Q      And do you know what Julie testified to?

A        I do not know what Julie testified to.

Q        Why did you think it was the 28th of May and now you are remembering that it's the 21st of May? Because Julie testified, as you probably know, that she was certain –

[ONE OF MR. JOHNSON'S LAWYERS]: Objection.

Q        -- it was the 28th of May.

THE COURT: Overruled.

Q        Do you know that she was certain that that visit that you spoke about, when you were there with Julie, was the 28th of May?

A        I do not know what she testified to.

Q        So you're just saying it's a coincidence that you originally thought it was the 28th and now are correcting that to the 21st?

A        I did feel that it was the 28th, because we went the Wednesday before Music Sunday, but then after talking with everybody, we realized that we had gone to Debbie and Steve Daniels' house on the 28th –

Q        So that's –

A        -- which would make it the 21st.

Q        That's what I asked you. I asked you if you talked to anyone about the case, and you said you didn't.

[ONE OF MR. JOHNSON'S LAWYERS]: Objection.

Q        That's exactly what I'm asking you.

THE COURT: Overruled.

Q        You have talked about this case a lot, and you've sat down with people and talked about dates, haven't you, as to when you last visited the child? Yes or no.

A    Yes.

Q    With Carol?

A    No.

Q    With whom?

A    With Janet and Erin.

Q    Why was Julie so certain that it was May 28th when she testified; do you know?

A    I do not know.

Q    Have you talked to her about that?

A    I have not.

Q    At all?

A    At all.

Q    Ever?

A    Ever.

Q    Would it surprise you to learn that she testified that you had talked about it, that all of you had sat down and got together and recreated these dates in your mind?

[ONE OF MR. JOHNSON'S LAWYERS]:  Objection.

Q    She talked about going over the calendar and you came up with the date of May 28th --

THE COURT: Overruled.

Q    -- as the last time you visited the child?

A    I'm sorry.  Could you please ask the question again?

Q    Would it surprise you to learn that Julie testified that there has been discussions between you and the other folks about the date that that last visit occurred?

A    No.

Q    So you have spoken about it.

A    I don't recall speaking to Julie about it.

Q    So you've spoken to Carol about it, you've spoken to Janet about it, and you've spoken to Erin about it.

When was it that you realized that you were wrong about the May 28th date?

A    Janet had come across a calendar where she had made a note in it, that we had gone and seen [N.J.] that night."

{¶47} During his cross-examination of Erin McPherson, the prosecutor again improperly put before the jury what Ms. Vandersommers supposedly had said:

"Q    Well, what about Carol -- no.  I'm talking about when you came up with the date of the 28th.  Originally you thought you had visited [N.J.] on May 28th and, in fact, one of your friends – Julie – came in and previously testified to that fact.  You're aware of that, aren't you?

A    No, I'm not.

Q    You're not aware that Julie has previously testified?

A    Well, I didn't know she came in.  I know that she talked with some attorneys.  I don't know --

Q    All right.  Well, she did.  She came in and testified on videotape.

A    Okay.

Q    And that was -- I believe it was the day before she went to Mexico.  Okay?

A    Hm-hm.

Q    And she testified she was sure that it was May 28th.

So at that point in time, you all believed that it was still May 28th, correct?

A     (Witness nodding affirmatively.)"

{¶48} And during his questioning of Janet Weant, he again made assertions about what Ms. Vandersommers had supposedly said:

"Q     Who did you speak with about this date after Julie testified?

A     I don't recall when we spoke to the attorneys, but we spoke to them at some point. I don't remember if that was before or after Julie testified.

Q     Well, certainly ma'am, if you had realized that you were wrong, you wouldn't have let Julie come in and testify under oath about the wrong date. After all, you have it written in your daily journal.

A     I don't know what Julie testified to. I wasn't there.

Q     So it just so happened that after she testifies and goes to Mexico, and was completely confused about the date of the visit, you came up with the fact that, 'Oh, no. Oh, my God, it wasn't the 28th. It was the 21st?'

A     All of us did not come up with that. I found the calendar in a basket of books and I checked the dates, and that's when I discovered that I had made notes on May 21st and May 28th. And I, after --

Q     Well --

A     -- looking at it and thinking about it for a couple of hours, decided I had to call the attorneys and tell them. I did not call the other girls and talk to them. I talked to the attorney. [One of Mrs. Johnson's lawyers] is who I called."

{¶49} The prosecutor's "cross-examination" of these women was improper, and the trial court should not have allowed him to get away with it. "In the first place, it is highly improper

for any lawyer in the trial of any jury case, civil or criminal, to make what amounts to testimonial assertions under the pretext that he is merely 'asking a question.' Secondly, it is unprofessional to put before a jury, under the pretext of asking questions, information that is not in evidence." *State v. Daugherty*, 41 Ohio App. 3d 91, 92-93 (1987) (citing 1 ABA Standards for Criminal Justice (2 Ed. 1980 and 1986 Supp.) 3.91, Standard 3-5.9 and DR 7-106(C)(1) of the Code of Professional Responsibility). By repeatedly referring to what Ms. Vandersommers supposedly testified at her deposition, the prosecutor was attempting to introduce testimony that was not properly before the jury. "While an attorney's lack of familiarity with the Rules of Evidence may affect the question of whether misconduct was intentional or inadvertent, ignorance of the Rules of Evidence does not render questioning allowable where it would otherwise be improper." *City of Sidney v. Walters*, 118 Ohio App. 3d 825, 829 (1997).

### Dr. Raggio

**{¶50}** During his cross-examination of Dr. Raggio, the prosecutor argued with her about whether she had refused to talk to him before trial and whether she had canceled a scheduled telephone conference:

"Q      Do you recall a phone conference that was supposed to be set up whereby you were going to meet with the attorneys by telephone, that you cancelled? Do you recall that --

A      Right.

Q      -- a couple of weeks ago, a month ago maybe?

A      I might have.

You know, again, as I said, most of my scheduling is done through my office manager, so --

Q      Yeah.

A      What attorneys?  The attorneys for --

Q      These attorneys.

I know you're busy.

[Mr. Johnson's lawyers], these two attorneys right here; Connie Hendricks, who's the attorney for JFS; and myself.

Do you recall that?

A      I recall having a conversation with [one of Mr. Johnson's lawyers], and I recall that we were not having a phone conversation.  Do you know what I'm saying?  That a phone conference --

Q      Yeah, I know what you're saying.  I asked the question.

You cancelled it, correct?  You have never spoken with anyone on our side, have you?

A      Correct.

Q      Why is that?

A      Why is that?  I don't know.

Q      Okay.  Well, I mean, it seems to me that you're pretty sure of yourself.  You've got nothing to hide, regardless of the six doctors that the State of Ohio brought in who are diametrically opposed to your medical opinion.

[ONE OF MR. JOHNSON'S LAWYERS]:  Objection, your Honor.

A      That's not necessarily true.

THE COURT: Overruled."

{¶51} The prosecutor's final "question" in the above quoted exchange was not a question, it was a statement. Statements are appropriate for closing arguments. They are not appropriate cross-examination. Further, although the prosecutor repeated his claim during close, his statement was not true, or at least not supported by the record. Dr. Raggio testified, to a reasonable degree of medical certainty, that N.J. had a Vitamin D deficiency that caused him to have abnormal bones and that his fractures were "consistent with a non-abuse situation." Although some of the doctors who testified for the State disagreed with Dr. Raggio's opinion, it was not true that all six of the doctors "brought in" by the State did. Included among those six were Dr. Carter, the emergency room doctor who initially saw N.J. at the Wadsworth-Rittman hospital, and Dr. Richard Skoblar. Neither was asked about Vitamin D deficiency, whether N.J. had abnormal bones, or whether his fractures were caused by abuse. Dr. Carter implied that he suspected abuse when he saw N.J., but he did not opine that his fractures were caused by abuse. If Dr. Carter and Dr. Skoblar disagreed with Dr. Raggio, therefore, they did so outside the record. It is inappropriate for a prosecutor to imply to the jury that he has knowledge of relevant facts not in the record. *State v. DePew*, 38 Ohio St. 3d 275, 287.

{¶52} A few pages later in the prosecutor's cross-examination of Dr. Raggio, they had an exchange about whether she had reviewed the x-rays of N.J.'s bones and whether x-rays would reveal bone fragility:

"Q      And I guess I'm a little unclear. I guess I don't know. It's a little unclear to me. Have you seen the x-rays or not?

A      Yes, I have.

. . . .

Q      Both the one from June and the one from January?

A    Correct.

Q    And is that the reason that you keep saying that that's a poor indicator for telling bone fragility, because the bones upon x-ray appear absolutely normal?

A    No.

Q    That is not the reason, or they don't appear normal?

A    No, that's not the reason.

Q    They do appear normal?

A    Correct.

Q    And would it surprise you to learn that the two radiologists who testified for the State of Ohio disagree with that opinion that you have, that x-rays are not a good way to tell bone density?

[ONE OF MR. JOHNSON'S LAWYERS]:  Objection, you Honor.

THE COURT: Basis?

[MR. JOHNSON'S LAWYER]:    Dr. Skoblar did not say that.  He said the opposite.

THE COURT: I'm going to overrule that objection.  You can continue, if you know.

THE WITNESS:    Could we just restate the question?

Q    Well, if the radiologist testified x-ray is a good way to tell bone density, would it surprise you to learn that?

A    Yes."

{¶53} The radiologists who testified for the State were Dr. Swanson and Dr. Skoblar. Neither testified that x-ray is a good way to tell bone density, and probably both would have been as surprised to hear the prosecutor's characterization of their testimony as was Dr. Raggio.

{¶54} Dr. Swanson, who looked at N.J.'s x-rays for the first time the morning before he testified, said that the bone density appeared normal. The prosecutor asked what he meant by that, and he responded that, "grossly," he did not see evidence of osteoporosis or osteopenia: "Well, it's a -- by plain film radiology, you cannot do bone density in children. There just are no standards. But just grossly, in a seven-week-old what would happen is, the bone ends would turn black first. In adults, you just lose density to the whole bone. It's kind of an estimate thing. But it may be pretty easy to see in babies because below the growth area, where there's increased blood supply, those areas turn black and you get a band, and that would be osteoporosis or osteopenia. And there's none of that." Nobody involved in this case suggested that N.J. had osteoporosis or osteopenia.

{¶55} Dr. Skoblar's testimony was that x-rays will not necessarily identify a bone disease:

"Q    Through x-rays you're able to identify fractures; isn't that correct?

A    Yes.

Q    All right. It won't necessarily identify whether there's an underlying bone disease; am I correct?

A    Correct.

Q    And that's not an area of your expertise?

A    Correct."

{¶56} The prosecutor, in other questions to Dr. Raggio, misrepresented Dr. Fleissner's testimony:

"Q      You think Dr. Fleissner agrees with you?

A      What's that?

Q      Do you think Dr. Fleissner agrees with you?

A      I didn't say he agreed with everything.

Q      What's his diagnosis?

A      What -- What he said is, he feels that it was non-accidental trauma.

Q      He thinks it's classic child abuse. 'Classic' is, I believe, the term. That's a direct quote, is it not?

A      I would have to look at that. Do you have the transcript? I would be happy to look at it.

Q      No, I don't.

He also said -- would you be surprised to learn that he said if a resident wouldn't diagnose -- if a first year resident wouldn't diagnose child abuse in this case, that he would kick him out of the program? Were you surprised to learn that he said that?

A      Would I be surprised to learn he said that? I can say anything you want.

Q      That wouldn't -- yeah, we know.

A      Right.

Q      But would you be surprised to learn that a doctor, who is in the same organizations as you are, who's an orthopedic surgeon, has that opinion, that if --

A      Yes.

Q       -- a first year resident wouldn't diagnose child abuse in this case, he'd kick him out of the program?

A       I would be very surprised he would say that . . . ."

{¶57} Although Dr. Fleissner testified that N.J.'s injuries "were consistent with child abuse, he never used the phrase "classic child abuse" that the prosecutor attributed to him. He also did not say that he would kick a first year resident who failed to diagnose child abuse in this case out of the program. The closest he came to such a colorful statement was the much-less colorful statement that, "[w]e teach our residents, if you see [the type of fracture N.J. had], you should be very suspicious of child abuse." Again, therefore, the prosecutor was either mischaracterizing Dr. Fleissner's testimony or relying on a conversation that took place outside the record. Either of which was inappropriate. The prosecutor repeated his improper statement during his closing argument.

{¶58} Another example of improper conduct occurred later in the prosecutor's cross-examination of Dr. Raggio:

"Q       Right. But he fractured thirteen times in the first seven weeks of his life and it stopped on June 6th and it hasn't happened since.

A       Exactly. Because he had the perfect storm on June 6th. He had the environmental deficiency in Vitamin D based on what he was getting; he had a mother who was deficient in Vitamin D, so where he was getting his nutrition from was low; he had a sustained fall down a flight of stairs.

Q       How do you know that?

A       Based upon what the family has said.

Q       What if that's not true?

A     Why would I believe it wasn't true?

Q     Because --

A     It's documented.

Q     Oh, okay, I'll answer that.  If you want to ask the question, I'll answer it.

[ONE OF MR. JOHNSON'S LAWYERS]:  Objection.

THE COURT: Oh, no, overruled.

Q     It's not true because this man broke thirteen bones in his baby's body and he lied about a fall down the steps that happened two days prior where he and his wife both said the child was fine.

[MR. JOHNSON'S LAWYER]:       Objection.

Q     That's why you would have reason to not believe that.

THE COURT: Overruled.

Q     But I guess you wouldn't know that if all you do is read the history."

The prosecutor was supposed to be cross-examining Dr. Raggio, not arguing with her.  His statement of his opinion that Mr. Johnson was lying was also inappropriate.  *State v. Williams*, 79 Ohio St. 3d 1, 12 (1997).

{¶59}  And yet another example of improper conduct during his cross-examination of Dr. Raggio:

"Q     [N.J.] had thirteen fractures in various stages of healing, and he has it (indicating) and his son doesn't even have it?  You have no evidence that his son [N.J.] has ever had secondary hyperparathyroidism.  There's no evidence of that, period.

A     We don't have the tests for that.  We don't have the --

Q     I know.  I agree.

A      But we have the perfect storm at the time that [N.J] --

Q      I know you keep saying that. It's a nice phrase, 'the perfect storm.' What that means to you is you're going to speculate as to what the results of a medical test, that wasn't done, would be back in 2008 on a seven-week-old with thirteen fractures.

A      Right. But we know that Vitamin D insufficiency in and of itself leads to fractures.

Q      No, no. I know you've said that. Everyone I've talked to and who's testified in this case, outside of you, disagrees with you on that.

[ONE OF MR. JOHNSON'S LAWYERS]: Objection, your Honor. It's an argument.

THE COURT: Overruled. Go ahead, your next question."

Again, the prosecutor was arguing, not asking questions. Further, by stating that everyone he talked to disagreed with Dr. Raggio regarding the effect of a Vitamin D deficiency, the prosecutor could have lead the jury to believe he had had conversations with experts who did not testify.

### Mr. Johnson

{¶60} The prosecutor's improper conduct continued during his cross-examination of Mr. Johnson:

"Q      Well, Mr. Johnson, there's nothing wrong with your son other than his father.

[ONE OF MR. JOHNSON'S LAWYERS]: Objection, your Honor.

THE COURT: I'll sustain the objection. Your next question, please.

Q      As we know now, right? Because he's not fracturing anymore, after you've not seen him --

[MR. JOHNSON'S LAWYER]:        Objection.

Q        -- right?

THE COURT: What's the basis of that objection?

Q        You know that, don't you?

[MR. JOHNSON'S LAWYER]:        Same objection.  He's not asking a question; he's arguing with the witness.

THE COURT: Well, I heard the question that time.  Overruled.  You can answer.

. . . .

Q        So the dog had nothing to do with your slip, you didn't trip over the dog?

A        The dog was right there, but I don't know where he was and if I tripped over the dog.  He was right there, he's always attached to me.  I mean --

Q        So what?  Why do you keep talking about the dog?  See, every time you tell this story, why do you throw that in there?  Why do you throw the dog in there if you slipped on the steps?  That has absolutely nothing to do with it.

A        It may have been a subconscious distraction, but I'm not --

Q        What does that mean?

A        Knowing that he was under my feet and moving, maybe a little one way or the other.  By no means am I blaming him.

Q        It's good to know you're not blaming your dog.  You've blamed everything else.

[ONE OF MR. JOHNSON'S LAWYERS]:    Objection.

Q        You've blamed the formula for your son's fractures.

THE COURT: Overruled.

Q      You've blamed it on that you have bad teeth and that you claim you have hearing loss.  You're blaming hereditary.  It's good to know you're not blaming your dog, Mr. Johnson.  Thank you for that.

THE COURT: Your next question please.

. . . .

Q      See, you were trying to make them think -- because no one was asking you about times and going to the hospital, you were trying to make that Court think that you did everything you could have done as soon as you noticed it.  'We got to the hospital as quick as we could,' right?

A      I wasn't trying to make anybody think anything.

Q      Yes, you were.  That's what you testified to.

What was the purpose of your testimony in talking about times?  What was the purpose of that?

A      I explained my story.  That's -- that's how -- that's the story.

Q      Yeah?  Well, now you're changing your story, and that's exactly the point.  See, Mr. Johnson, facts don't change.  The truth doesn't change.  It's when you make thing up that things change and you get caught.

[ONE OF MR. JOHNSON'S LAWYERS]:  Objection, your Honor.

Q      Just like what's happening right now.

THE COURT: Your question, please, Mr. [prosecutor]."

. . . .

Q      Okay.  So what happened?  When did your -- let's start when Carol got home.  Go ahead, Mr. Johnson.

A    Carol got home at 12:30, 1 o'clock, like I said, about.

Q    Well, let me stop you right there. That's not what you said.

A    I've been saying 12:30 to 1 o'clock all along. To our knowledge, it's probably 12:45, 12:40.

Q    So she got home probably about 12:30-ish, thereabouts.

A    Well, she doesn't get out till 12:00. It would have taken her at least a half hour to get home so --

Q    I know. That's 12:30.

A    Right.

Q    Okay, go ahead. Go ahead.

A    She came in the house, said hello to both of us. Like I said, [N.J.] was on the bed.

And we discussed what we were going to do that afternoon, because she had been off. That conversation probably went on, you know, that's what I said, probably fifteen minutes.

Then after that, she went and got [N.J.]. [N.J.] had been sleeping, because when I -- when he woke up around 10:30 or so, for me to feed him, he fell -- when I was done feeding him, he fell back to sleep on the bed.

Q    Mr. Johnson, tell me what happened when your wife got home. I know you're stalling for time, but tell me what happened after Carol got home.

**{¶61}** The prosecutor also committed improper conduct during his closing argument by expressing his personal belief about Mr. Johnson's credibility and by suggesting that his lawyers were insincere:

"And when you've done something for as long as I've done this, that is a predictable, predictable thing. When he got on the witness stand, I could have told you beforehand, and it came true, that he was going to lie to you about it, and he did.

Now, does that mean that he broke [N.J.'s] arm? No. But it shows you, when he tells you he didn't, what kind of person he is. He's going to lie to you about everything. He lies to everybody about everything.

[Mr. Johnson's lawyers] have done a fantastic job of confusing you, and if I didn't know what I knew and if you didn't know what you knew, you'd be thoroughly confused.

Now, I would love to be able to interact with you, because I would ask, 'Do you think that they think the fractures happened, or didn't they?' Because from those closing arguments, you certainly can't tell, right? You kept hearing that the fractures weren't there in the photos that you saw. 'The kid's fine. There's nothing wrong with the boy.' That's what [one of Mr. Johnson's lawyers] just said. Dr. Oehlenschlager would never know it because he didn't have those fractures.

Wait a minute. Wait a minute. We know that he did. We know that he did. Are they disputing the fact that he has fractures? It seems that way, doesn't it?

But you can't dispute that, you cannot dispute that, but they are disputing it, and that's, allegedly, the reason they are showing you those photos.

[ONE OF MR. JOHNSON'S LAWYERS]: Objection.

THE COURT: Overruled.

[THE PROSECUTOR]: They are talking about Dr. O. as if he went to Dr. O. and he didn't have any fractures. That's what they're saying to you. That's what they said over and over and over again, both of them.

Well, how ridiculous is that? They're trying to confuse you. Did he have the fractures or not? 'Yes, he did,' or 'No, he didn't. That really sounds kind of like his client up there. Which is it?"

**{¶62}** Lawyers are forbidden from stating a personal opinion about the credibility of a witness. *State v. Smith*, 14 Ohio St. 3d 13, 14 (1984). Despite that, the prosecutor in this case told the jury that he could have predicted that Mr. Johnson would lie on the witness stand and that he, in fact, did so. And in *State v. Keenan*, 66 Ohio St. 3d 402, 405 (1993), the Ohio Supreme Court wrote that imputing insincerity to defense counsel was improper. By suggesting to the jurors that Mr. Johnson's lawyers were trying to confuse them, the prosecutor suggested that his lawyers did not believe in his innocence. That was improper.

### Effect of the Improper Conduct

**{¶63}** Despite the prosecutor's widespread improper conduct, we may not reverse Mr. Johnson's convictions unless the prosecutor's improper conduct deprived him of a fair trial. *State v. Fears*, 86 Ohio St. 3d 329, 332 (1999). A trial should not be deemed "unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments." *State v. Skatzes*, 104 Ohio St. 3d 195, 2004-Ohio-6391, at ¶181.

**{¶64}** Because we must examine the prosecutor's improper conduct in the context of the entire trial, we will only discuss the effect of a few of the instances individually. First, we note that, even though the prosecutor browbeat the church women about the fact that they initially thought they had visited the Johnsons on May 28, their revision of the date to May 21 was actually beneficial to the prosecution because it placed their visit outside of the two-week window of when Dr. Steiner opined that the abuse had occurred. We also note that, by

repeatedly misstating the testimony of the other doctors to Dr. Raggio, the prosecutor risked antagonizing the jury. The trial court allowed the jury to take notes during the two week trial and to refer to those notes while they deliberated. Accordingly, while it is possible that the prosecutor mislead the jury when he misrepresented the testimony of prior witnesses, it is also possible that his misrepresentations undermined the State's case. We further note that, while not all of the doctors who testified for the State said that N.J.'s injuries appeared to be the result of abuse, most of them did. While the prosecutor may have exaggerated the point, therefore, it is not disputed that the only doctor who opined that N.J.'s injuries were not the result of abuse was Dr. Raggio.

{¶65} Considering the prosecutor's misrepresentation of witness testimony with his overall argumentativeness and his expressions of personal belief, the question of whether his conduct deprived Mr. Johnson of a fair trial is an extremely close one. We must consider, however, not only the improper conduct, but also the strength of the evidence in support of conviction. See *State v. Fears*, 86 Ohio St. 3d 329, 336 (1999) ("The evidence of guilt in this case is so overwhelming that none of the prosecutors' comments, even if error, amounted to reversible error.").

{¶66} Mr. Johnson did not contest that his seven-week old son had 13 fractures of his arms, legs, ribs, and skull, and did not present any evidence contesting Dr. Steiner's testimony about the age of the fractures. He also did not dispute that he was N.J.'s primary caregiver and that he was the only one with N.J. the morning that N.J.'s humerus displaced. Instead, he offered two explanations for how the injuries had occurred while N.J. was in his care. First, he argued that they must have been the result of N.J.'s accidental falls off the couch and down the steps,

including his belief that N.J.'s humerus displaced spontaneously two days after it broke in the fall. Second, he argued that N.J. has abnormal bones that fracture under normal handling.

{¶67} Whether the jury believed Mr. Johnson's first explanation depended on its assessment of his credibility. Notwithstanding the prosecutor's improper comments to Mr. Johnson, Mr. Johnson did not have an explanation for how N.J.'s humerus displaced between the time he laid him down for a nap and when Mrs. Johnson got home from work. He also was not able to adequately explain what happened between the time Mrs. Johnson got home and the time they got to the hospital. The gaps in his testimony had nothing to do with the prosecutor's conduct.

{¶68} Regarding Mr. Johnson's fragile bones explanation, it depended on whether the jury believed that a Vitamin D deficiency itself could cause bone fragility. While Dr. Raggio testified that it could, the evidence demonstrated that many of N.J.'s extended family members are also deficient in Vitamin D, but do not have the same propensity to fracture. There was also uncontroverted evidence that N.J. stopped experiencing broken bones as soon as he was taken out of Mr. Johnson's care. Mr. Johnson's trial was in June 2009, one year after N.J. suffered his injuries. During that year, N.J. did not experience any fractures, compared to the 13 he suffered in a two-week period under Mr. Johnson's care.

{¶69} In *Fears*, former Chief Justice Moyer noted that courts often comment on the misconduct of prosecutors, but declare their conduct to be nonprejudicial in light of the overwhelming evidence of guilt. *State v. Fears*, 86 Ohio St. 3d 329, 350 (1999) (Moyer, C.J., concurring in part and dissenting in part). He noted that, despite the Ohio Supreme Court's admonitions about misconduct, "our protestations have failed to change the advocacy of some prosecutors. It is as if they intentionally engage in improper conduct, safe in the belief that this

court will continue to protest with no consequences." *Id.* at 352. He recommended that reviewing courts, "[i]n the interest of the integrity of the criminal justice system in this state, . . . demonstrate that our protestations are more than utterings of frustration." He also warned that "[r]efusing to address the fundamental unfairness of a trial riddled with prosecutorial misconduct because . . . [the reviewing] court deems the evidence of guilt to be overwhelming creates the perception that we protect the right to a fair trial only when we believe that the defendant is not guilty." *Id.* at 353; see also *United States v. Antonelli Fireworks Co. Inc.*, 155 F.2d 631, 661 (1946) (Frank, J., dissenting) ("If we continue to do nothing practical to prevent [prosecutorial mis]conduct, we should cease to disapprove it. For otherwise . . . [t]he deprecatory words we use in our opinions on such occasions are purely ceremonial. . . . The practice . . . breeds a deplorably cynical attitude towards the judiciary.").

{¶70} While we agree with Chief Justice Moyer's sentiment, the Ohio Supreme Court has instructed that we should "not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments." *State v. Skatzes*, 104 Ohio St. 3d 195, 2004-Ohio-6391, at ¶181. Upon review of the entire record in this case, we conclude that the jury would have found Mr. Johnson guilty even if the prosecutor had acted properly. While this conclusion may do nothing to curb the behavior of the prosecutor, we note a suggestion from the Eighth District that, "[i]f we are to stop short of punishing the State for a prosecutor's misbehavior by refusing to overturn otherwise valid convictions, perhaps such cases should routinely be referred to disciplinary counsel so that individual prosecutors can be impressed with the need for ethical behavior." *State v. Cody*, 8th Dist. No. 77427, 2002-Ohio-7055, at ¶38.

The Prosecutor's Opening

**{¶71}** Mr. Johnson's final argument regarding prosecutorial misconduct is that the prosecutor's improper conduct began during his opening statement to the jury. He has argued that the prosecutor improperly suggested that Mr. Johnson would put on a defense based on vitamin D deficiency and improperly implied that he had some type of "burden of evidence." The prosecutor told the jury, "I expect that you'll hear some medical evidence from the defense on some theories, and the State will vigorously dispute all of those." He later told the jury that "they're making the defense -- I don't mean to be disrespectful, but the Johnsons have found a doctor in New York who's apparently willing to come in here to say that she believes that that was the cause of the fractures, some Vitamin D deficiency." Mr. Johnson has suggested that, in the absence of the prosecutor's comments, he may have decided to not put on a defense or, after the prosecutor and trial court dismissed the charges against his wife mid-trial, may have wished to change his defense. He claims, however, that the prosecutor's alleged improper conduct "pigeon-holed" him into the bone-disorder defense.

**{¶72}** Even if it is assumed that the prosecutor's statements during his opening regarding the Johnsons' anticipated defense would have been improper if the jury was hearing about that anticipated defense for the first time from the prosecutor, we cannot determine that it was improper in this case because we can't tell whether he was already "pigeon-holed" into that defense before the prosecutor's opening. Mr. Johnson did not include the jury voir dire in the transcript he provided us. Accordingly, we can't tell to what extent he or Mrs. Johnson had already raised the question of a Vitamin D deficiency during their questioning of prospective jurors. See *State v. Boeddeker*, 12th Dist. No. CA2009-05-029, 2010-Ohio-106, at ¶15 (concluding that prosecutor's statement about what the defense would try to prove was not

improper because it "was merely referencing strategy Boeddeker's trial counsel had already made reference to during voir dire and what the general nature of the case would be."). The prosecutor's opening included, shortly before his statement quoted above about the Johnsons finding a doctor in New York who would say that N.J.'s fractures were caused by a Vitamin D deficiency, a reference to hyperparathyroidism, which had apparently come up during voir dire: "So now I think, after that, you are going to hear medical evidence of some type of Vitamin D deficiency, which is why you heard the term, from [one of Mrs. Johnson's lawyers], hyperparathyroidism."

**{¶73}** The prosecutor was argumentative, asked improper questions, made testimonial assertions, referred to facts that were not in the record, misrepresented the evidence, and expressed his personal opinion of Mr. Johnson's credibility. We conclude, however, that because the jury would have found Mr. Johnson guilty of felonious assault and child endangering even if the prosecutor had acted properly, Mr. Johnson has not established that the prosecutor's improper conduct deprived him of a fair trial. Mr. Johnson's second and third assignments of error are overruled.

ALLIED OFFENSES

**{¶74}** Mr. Johnson's seventh assignment of error is that his convictions for felonious assault and child endangering for May 31 through June 6, 2008, and for June 6, 2008, violate double jeopardy and Section 2941.25(A) of the Ohio Revised Code. Under Section 2941.25(A) of the Ohio Revised Code, "[if] the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." According to the Ohio Supreme Court, Section 2941.25(A) "incorporates the constitutional protections against double

jeopardy[,]" which "forbid successive prosecutions and multiple punishments for the same offense." *State v. Whitfield*, 124 Ohio St. 3d 319, 2010-Ohio-2, at ¶7. "[F]or purposes of R.C. 2941.25, a 'conviction' consists of a guilty verdict *and* the imposition of a sentence or penalty." *Id*. at ¶12.

{¶75} Because Mr. Johnson was only sentenced on three counts and, therefore, only "convicted" of three counts, this Court must first determine which offenses those were. R.C. 2941.25(A). It is a difficult process in this case because the trial court went back and forth throughout the proceedings, either referring to the counts by the number they had been assigned in the indictment or the number they were assigned in the jury instructions. In the indictment, count one charged Mr. Johnson with child endangering under Section 2919.22(B)(1) on or about May 23 through May 30, 2008. In the jury instructions, that charge became count four. Indictment count two, which became jury instruction count one, charged Mr. Johnson with felonious assault on or about May 23 through May 30, 2008. Indictment count three, which became jury instruction count five, charged Mr. Johnson with child endangering under Section 2919.22(B)(1) on or about May 31 through June 6, 2008. Indictment count four, which became jury instruction count two, charged Mr. Johnson with felonious assault on or about May 31 through June 6, 2008. Indictment count five, which became jury instruction count six, charged Mr. Johnson with child endangering under Section 2919.22(B)(1) on or about June 6, 2008. Indictment count six, which became jury instruction count three, charged him with felonious assault on or about June 6, 2008. Indictment counts seven and eight, which charged Mr. Johnson with child endangering under Section 2919.22(A), remained the same in the jury instructions.

{¶76} The jury exonerated Mr. Johnson on "count one," which was indictment count two, but found him guilty of the other offenses. At Mr. Johnson's sentencing hearing, the trial

court referred to the charges by their indictment number. It told the parties that it considered the felonious assault and endangering children charges under Section 2919.22(B)(1) for each respective time period to be companion cases that were allied offenses of similar import. It also told the parties that it thought that the child endangering charges under Section 2919.22(A) overlapped with the other charges. It, therefore, merged count three with count four, count five with count six, and counts seven and eight with the others. It told Mr. Johnson that it was going to sentence him to six years on count one, seven years on count four, and seven years on count six, which would run consecutively.

{¶77} In its sentencing entry, the trial court referred to the offenses by their jury instruction numbers. It wrote that "Count III, 'Felonious Assault,' . . . and Count IV, 'Endangering Children,' . . . are allied offenses" and that "Count V, 'Endangering Children,' . . . and Count VI, 'Endangering Children,' . . . are allied offenses[.]" It sentenced Mr. Johnson to six years "on Count II, 'Felonious Assault,'" seven years "on Count III, 'Felonious Assault,'" and seven years "on Count V, 'Endangering Children,'" which it ordered to run consecutively. It imposed "no sentence on Count IV, 'Endangering Children' . . . Count VI, 'Endangering Children' . . . [Count] VII, 'Endangering Children' . . . [or] Count VIII, 'Endangering Children . . . .'"

{¶78} A trial court speaks only through its journal entries. *Kaine v. Marion Prison Warden*, 88 Ohio St. 3d 454, 455 (2000). Accordingly, even though the trial court told Mr. Johnson that it was sentencing him on counts one, four, and six as those offenses were numbered in the indictment, it actually sentenced him on counts two, three, and five, as those counts were charged to the jury. In the jury instructions, count two alleged that Mr. Johnson committed felonious assault on or about May 31 through June 6, 2008. Count three alleged that he

committed felonious assault on or about June 6, 2008. Count five alleged that he committed child endangering on or about May 31 through June 6, 2008. The trial court, therefore, sentenced Mr. Johnson for two offenses allegedly committed on or about May 31 through June 6, 2008, and did not sentence him for any offenses committed on or about May 23 through May 30, 2008.

{¶79} At the sentencing hearing, the trial court explained that Mr. Johnson's convictions of felonious assault and child endangering for May 31 through June 6, 2008, were allied offenses of similar import. Nevertheless, it sentenced him for both offenses in its sentencing entry. Mr. Johnson has argued that was error. He has also argued that the two felonious assault convictions for which he was sentenced are duplicative because they both encompass June 6, 2008. According to Mr. Johnson, even if the jury believed that the only injury that occurred during the period of May 31 through June 6, 2008, was the fracture to N.J.'s arm on June 6, 2008, the instructions required it to convict him of both counts encompassing that date.

{¶80} At the time of sentencing, Ohio Supreme Court precedent on allied offenses required courts to analyze charges in the abstract. *State v. Rance*, 85 Ohio St. 3d 632, paragraph one of the syllabus (1999). In December 2010, however, the Supreme Court overruled *Rance*, holding that, "[w]hen determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *State v. Johnson*, 128 Ohio St. 3d 153, 2010-Ohio-6314, syllabus.

{¶81} Although the trial court appears to have incorrectly sentenced Mr. Johnson for two offenses that it had determined were allied, it made that determination under *Rance*. We have repeatedly declined to apply *Johnson* in the first instance. See *State v. Vitt*, 9th Dist. No. 10CA0016-M, 2011-Ohio-1448, at ¶8; *State v. Maple*, 9th Dist. No. 25313, 2011-Ohio-1216, at

¶8; *State v. Washington*, 9th Dist. Nos. 10CA009767, 10CA009768, 2011-Ohio-1149, at ¶27; *State v. Brown*, 9th Dist. No. 25287, 2011-Ohio-1041, at ¶50. Accordingly, we vacate Mr. Johnson's sentence and remand to the trial court for it to reexamine whether Mr. Johnson's felonious assault and child endangering convictions are allied offenses under *State v. Johnson*, 128 Ohio St. 3d 153, 2010-Ohio-6314. To the extent that Mr. Johnson has argued that he was incorrectly sentenced for felonious assault and child endangering for May 31 through June 6, 2008, his seventh assignment of error is sustained.

**{¶82}** To the extent Mr. Johnson has argued that the overlapping dates on the felonious assault charges confused the jury, we note that he did not request a clarifying instruction or object to the jury instructions that were given. Accordingly, he has forfeited his right to challenge the instructions. *State v. Feliciano*, 9th Dist. No. 09CA009595, 2010-Ohio-2809, at ¶8. He has also failed to argue or demonstrate plain error regarding this issue. See *id*. Accordingly, to the extent that Mr. Johnson has argued that he could not be convicted of felonious assault for May 31 through June 6, 2008, and, separately, for June 6, 2008, his seventh assignment of error is overruled.

CONCLUSION

**{¶83}** Mr. Johnson's convictions for felonious assault and child endangering are supported by sufficient evidence and are not against the manifest weight of the evidence. The prosecutor's improper conduct did not deprive Mr. Johnson of a fair trial. The trial court, however, incorrectly determined that Mr. Johnson's child endangering convictions were felonies and may have incorrectly sentenced him on allied offenses under *State v. Johnson*, 128 Ohio St. 3d 153, 2010-Ohio-6314. Mr. Johnson's sentence is vacated, and this cause is remanded for proceedings consistent with this opinion.

Judgment affirmed in part,
sentence vacated,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

CLAIR E. DICKINSON
FOR THE COURT

WHITMORE, J.
CONCURS

CARR, J.
CONCURS IN PART, AND DISSENTS IN PART, SAYING:

{¶84} I respectfully dissent in regard to the first assignment of error. The facts here are distinguishable from the facts the Supreme Court confronted in *State v. Pelfrey*, 112 Ohio St.3d

422, 2007-Ohio-256. Johnson was convicted of multiple counts of both felonious assault and child endangering. When the crime of child endangering under R.C. 2919.22 results in serious physical harm to a child, a violation of R.C. 2919.22(A) is elevated to a felony of the third degree, and a violation of R.C. 2919.22(B)(1) is elevated to a felony of the second degree. R.C. 2919.22(E)(2)(c), (d). Such was the case here, where Johnson committed several counts of child endangering, which resulted in serious physical harm to N.J., while committing separate counts of felonious assault. The offenses related to the same sets of facts and the jury contemporaneously found Johnson guilty of multiple counts of both child endangering and felonious assault. Thus, I would not extend *Pelfrey* to the facts of this case.

**{¶85}** With respect to Mr. Johnson's seventh assignment of error, I find it significant that the sentencing entry from which Johnson appeals was journalized prior the Supreme Court of Ohio's decision in *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314. In *Johnson*, the Supreme Court reevaluated its allied offense jurisprudence and implemented a conduct-based approach. As the trial court did not have the opportunity to apply *Johnson* to the facts of this case, I would simply remand this matter to the trial court, without any additional analysis, for a determination as to whether the defendant's offenses are, in fact, allied offenses of similar import under *Johnson*. *State v. Brown*, 9th Dis. No. 25287, 2011-Ohio-1041, at ¶50, citing *Johnson* at ¶49-50. Accord *State v. Wenker*, 9th Dist. No. 25185, 2011-Ohio-786, at ¶21-22.

**{¶86}** I concur in judgment only with respect to the remainder of the opinion.

APPEARANCES:

WILLIAM T. WHITAKER, and ANDREA L. WHITAKER, Attorneys at Law, for Appellant.

DEAN HOLMAN, Prosecuting Attorney, and RUSSELL A. HOPKINS, Assistant Prosecuting Attorney, for Appellee.