[Cite as *State v. Benitez*, 2011-Ohio-5498.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No.   96257

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## HAROLD BENITEZ

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-532753

**BEFORE:**   Boyle, P.J., Sweeney, J., and Jones, J.

**RELEASED AND JOURNALIZED:**   October 27, 2011

**ATTORNEY FOR APPELLANT**

Edward S. Wade, Jr.
75 Public Square
Suite 1111
Cleveland, Ohio   44113

**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor
BY:   Mark J.   Mahoney
Assistant County Prosecutor
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

MARY J. BOYLE, P.J.:

{¶ 1}   Defendant-appellant, Harold Benitez, appeals his gross sexual imposition and kidnapping convictions.   He raises four assignments of error for our review:

{¶ 2}   "[1.] Prosecutorial misconduct denied appellant his constitutional right to a fair trial.

{¶ 3}   "[2.] The trial court erred when it permitted testimony of other crimes, acts, or wrongs, attributed to defendant-appellant to be introduced without objection and by its

failure to give a limiting instruction during the course of trial and in the general charge to the jury, the purposes for which evidence presented by the prosecutor could be used.

**{¶ 4}** "[3.] The court erred by the court's own abuse of discretion in failing to allow defendant-appellant to present witnesses that the state had called in the case in chief.

**{¶ 5}** "[4.] Defendant-appellant's convictions were contrary to the manifest weight of the evidence."

**{¶ 6}** Finding no merit to his appeal, we affirm.

<u>Procedural History and Factual Background</u>

**{¶ 7}** In January 2010, Benitez was indicted on 32 counts: ten counts of rape, with notice of prior conviction, repeat violent offender, and sexually violent predator specifications; ten counts of gross sexual imposition, with sexually violent predator specifications; ten counts of kidnapping, with notice of prior conviction, repeat violent offender, and sexual motivation specifications; and two counts of disseminating matter harmful to juveniles, with a furthermore clause that the victim was under 13. The notice of prior conviction, repeat violent offender, and sexually violent predator specifications were bifurcated and tried to the court. The following facts were presented to a jury.

**{¶ 8}** Selena Perez ("Selena") had five children when she met Benitez, although she did not have custody of them at that time; their father did. Selena moved in with

Benitez in September 2005, soon after she met him. In June 2007, Selena regained custody of her five children, and they moved in with her and Benitez at that time.

{¶ 9} Selena's daughter, A.F., who was 11 years old at the time of the trial, testified that within "a few weeks" after she and her siblings moved in with Selena and Benitez, Benitez began to come to her bedroom at night. A.F. explained that Benitez would remove her from her top bunk bed and carry her to his bedroom that he shared with Selena, and he would lock the door. Selena worked nights most of the time, and was not home when this happened.

{¶ 10} A.F. testified that Benitez would remove her pants, underwear, and shirt, and touch her with "his mouth and his hands," on her chest and her "two private parts." She demonstrated on a koala bear how Benitez would "rub" her chest and "private parts" with his hands. A.F. said that Benitez would touch her chest with his mouth like "a baby does to a mom." She further stated that Benitez would touch her between her legs with his tongue "like he keeps licking a lollipop." A.F. denied that Benitez ever touched her on the inside of her vagina, nor did he ever touch her with his penis. But A.F. did state that Benitez tried to get her to touch his "private parts," which she did "sometimes," but other times she just "held [her] arms closed."

{¶ 11} A.F. testified that Benitez did this "almost every night," and it happened "more than 30 times, *** maybe even more than 50."

{¶ 12} A.F. further testified that Benitez would also come into the bathroom when she was taking a shower and "open up the curtains." And other times, when Benitez was taking a shower, A.F. would have to use the bathroom when Benitez was showering because it was the only bathroom, and he would open the curtain and show her "everything."

{¶ 13} A.F. also testified that "a few times" Benitez showed her pornographic material on the internet. He showed her a naked photo of an actress from High School Musical and told A.F. that she looked like the actress. Another time, Benitez showed her a video of a man and a woman who were not wearing clothes, and said, "that's what me and your mom did, and that's what your grandma and grandpa did."

{¶ 14} In the summer of 2009, A.F. began to tell her mother and her paternal aunt, Megan Fallon, that she wanted to move to Arizona to live with her aunt. A.F.'s mother agreed to let her move to Arizona with Fallon. A.F. moved to Arizona in September 2009.

{¶ 15} In December 2009, right before Fallon was going to bring A.F. back to Ohio to visit for Christmas, Fallon testified that A.F. began acting "odd." Although A.F. was excited to go back to Ohio to visit her family, she did not want to stay at Selena's and Benitez's home. A.F. wanted to stay with Fallon at A.F.'s paternal grandmother's home and just visit her mother, Benitez, and her siblings.

{¶ 16} Then, one evening, two days before they left for Ohio, Fallon testified that she and A.F. were watching Law and Order Special Victims Unit. Fallon testified that A.F. got angry at one point while watching the show. Fallon explained that there was an "episode where a little girl was being questioned and being prompted, to *** tell the detective that was questioning her that it would be okay if she just, you know — just go ahead and tell us. Everything will be okay." Fallon said that A.F. got angry, and said, "I hate when they tell little kids that stuff. So I don't know why they would tell somebody that when that's not true." Fallon asked her if something was wrong. Eventually, A.F. began crying and told Fallon what Benitez had done to her.

{¶ 17} A.F. testified that she never told anyone before she told her aunt because she was afraid of Benitez. A.F. said that Benitez had told her that "he had shot a guy and that ––– one time he said that people from Puerto Rico don't mess around with people." A.F. also said that Benitez told her not to tell her mom "because [her] mom's happy now and that it would break her heart." A.F. further explained that for a long time, she thought it was her fault that it happened because she "didn't do anything. I could have yelled. I could have screamed, but I didn't."

{¶ 18} A.F. further testified that when she and Fallon came to Ohio for Christmas, her mom "barely wanted to see [her] or look at [her]." A.F. talked to the police, doctors, and social workers while she was in Ohio.

{¶ 19} A.F.'s older brother, A.U., testified. He was 13 years old at the time of trial. He stated that when he lived with his mother and Benitez, Benitez showed him "pornographical material." Most of the time, A.U. would "walk in" on Benitez viewing pornographic material and Benitez would allow him to see it, but "a couple times," Benitez asked him to look at it.

{¶ 20} Selena testified that she did not believe A.F. was telling the truth about Benitez sexually abusing her. For that reason, Children and Family Services removed all of her children from her custody for "failure to protect." Selena did find out that Benitez was showing A.U. pornographic material after Children and Family Services became involved with the family, and told her about it. Selena further testified that she received a letter from Benitez admitting that he had shown A.U. pornographic material, but he said he did it for sex education purposes.

{¶ 21} Sheryl Zubal, social worker at Children and Family Services, testified that she became involved with Selena, Benitez, and the children in the fall of 2009, after A.F. had moved to Arizona. Selena explained that it was her younger son's (A.V.'s) daycare worker who called Children and Family Services on the family. Later, in December 2009, Zubal learned of A.F.'s sexual abuse allegations against Benitez. Soon after that, Zubal also learned from A.U. that Benitez had been showing him pornographic material.

{¶ 22} Kathleen Goelnetz, a sexual assault nurse examiner, testified that she examined A.F. in December 2009. Although there was no physical evidence of sexual

abuse, she testified as to what A.F. told her about what Benitez had done to her. A.F. told Goelnetz nearly the same story as to what she testified to in court.

{¶ 23} Benitez testified on his own behalf and presented three other witnesses: his nieces, Myra and Giezi Latorre, and Karen Perez (Selena's sister). All three women testified that they used to help Benitez and Selena take care of the children. They all testified that they had babysat the children and had seen A.F. watching Law and Order Special Victims Unit many times. They also testified that Benitez had never done anything inappropriate to them, nor had they seen him do anything inappropriate to A.F.

{¶ 24} Benitez testified that he had never done anything to A.F. He said that he was the one who suggested that she go to Arizona to live with her aunt. Benitez admitted to showing pornographic material to A.U., but said that it was only for educational purposes.

{¶ 25} The jury found Benitez not guilty of the rape counts, but guilty of the gross sexual imposition, kidnapping counts with sexual motivation specifications, and disseminating matter harmful to juveniles. The trial court found defendant guilty of the repeat violent offender, sexually violent predator, and notice of prior conviction specifications. The court then sentenced Benitez to 40 years to life in prison, and advised Benitez that he would be subject to a mandatory five years of postrelease control upon his release from prison. The trial court further notified Benitez that he was labeled a Tier III sex offender. It is from this judgment that Benitez appealed.

## Prosecutorial Misconduct

{¶ 26} In his first assignment of error, Benitez argues that his constitutional rights were violated because of two instances during the trial where "the prosecutor undertook a line of questioning, which was highly inflammatory and prejudicial to defendant-appellant's right to a fair and impartial trial." Both instances occurred when the prosecutor was cross-examining Benitez.

{¶ 27} The standard of review for prosecutorial misconduct is whether the comments and questions by the prosecution were improper, and, if so, whether they prejudiced appellant's substantial rights. *State v. Treesh*, 90 Ohio St.3d 460, 480, 2001-Ohio-4, 739 N.E.2d 749. Prosecutorial misconduct will not provide a basis for reversal unless the misconduct can be said to have deprived the appellant of a fair trial based on the entire record. *State v. Lott* (1990), 51 Ohio St.3d 160, 166, 555 N.E.2d 293. "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, quoting *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

{¶ 28} Benitez first claims that the prosecutor improperly questioned him about "a new and unsubstantiated allegation of beating the children." The following exchange took place when the prosecutor cross-examined Benitez:

{¶ 29} "Q. Mr. Wade asked you about spanking the children, and you said just the younger ones. Isn't it true, yes or no, that you did hit [A.V.] and [A.S.] with a belt?

{¶ 30} "A.   No.

{¶ 31} "Q.   Was there an investigation regarding *** hitting [A.S.] and [A.V.] with a belt?

{¶ 32} "***

{¶ 33} "A. I don't know.

{¶ 34} "Q. You don't know if there was an investigation regarding hitting the children with a belt?

{¶ 35} "A.   With a belt, no.

{¶ 36} "Q.   No?

{¶ 37} "A. No.   I just remember that there was [an] investigation because somebody said that the kid was hit in the house or something like that.

{¶ 38} "Q. That you were beating the children, right?   Yes or no?

{¶ 39} "A.   It wasn't me.

{¶ 40} "Q.   It wasn't you, but somebody was beating the children."

{¶ 41} The fact that Benitez allegedly hit A.V. and A.S. (A.F.'s younger siblings) with a belt first came to light during Benitez's cross-examination of A.F.   Benitez's defense counsel asked A.F. if Benitez had ever spanked her.   A.F. replied, "No.   That was only [A.V.] and [A.S.].   He would hit them bad with the belt.   Sometimes he would hit him — [A.V.] so hard that he would have red welts on his back for a day or two."

{¶ 42} Defense counsel then asked A.F. who A.V. was. A.F. replied that he was her younger brother and further offered, "[h]e would sometimes misbehave, and sometimes [Benitez], he would whoop him with a belt. And sometimes he would threaten him with a belt. He'd say, [A.V.], come here. I'm going to hit you with the belt. I'm going to whoop him with the belt."

{¶ 43} Then, during Benitez's direct-examination, his defense counsel asked him, "Did you treat [Selena's children] harshly?" Benitez replied, "[o]nly when they misbehave." Defense counsel then asked, "when you say you treat them harshly, how would you punish them? What was your form of discipline?" Benitez responded, "Discipline was — they disobey, they go in the corner, no TV. They can't go outside, and they can do whatever activity but in their rooms. That was it."

{¶ 44} After reviewing the entire record, it was Benitez who first put the issue of "beating the children" before the jury — through A.F.'s answer during cross-examination. But the prosecutor's questions regarding Children and Family Services' investigation into allegations that Benitez hit A.V. and A.S. with a belt was not before the jury. Selena testified that Children and Family Services became involved with her family after A.V.'s daycare called the agency, but she did not say what the allegations were. Although the prosecutor attempted to get Sheryl Zubal (the children's social worker) to testify to the exact allegation that led to the initial investigation in the fall of 2009, the trial court properly sustained defense counsel's objection as to that matter and would only

permit Zubal to discuss the allegations involving A.F. and A.U. Thus, the prosecutor's questions regarding Children and Family Services' investigation into A.V. and A.S. were improper. Additionally, the prosecutor's comment, "It wasn't you, but somebody was beating the children," was improper.

**{¶ 45}** "'[I]t is highly improper for any lawyer in the trial of any jury case, civil or criminal, to make what amounts to testimonial assertions under the pretext that he is merely "asking a question." Secondly, it is unprofessional to put before a jury, under the pretext of asking questions, information that is not in evidence.' *State v. Daugherty* (1987), 41 Ohio App.3d 91, 92-93, 534 N.E.2d 888 (citing 1 ABA Standards for Criminal Justice (2 Ed.1980 and 1986 Supp.) 3.91, Standard 3-5.9 and DR 7-106(C)(1) of the Code of Professional Responsibility)." *State v. Johnson*, 9th Dist. No. 09CA0054-M, 2011-Ohio-3623, ¶49.

**{¶ 46}** Benitez further claims that the prosecutor improperly cross-examined him about his prior felonious assault conviction. The following exchange took place:

**{¶ 47}** "Q. [A.F.] testified that you told her that you were a very bad man, a bad guy who shot someone. You weren't lying when you told her that *** were you?

**{¶ 48}** "A. I didn't say that.

**{¶ 49}** "Q. You never told her that?

**{¶ 50}** "A. I never say that.

**{¶ 51}** "Q. So was [A.F.] wrong *** when she said that you told her that you were a bad guy who shot someone, or was she right, that that's true?

**{¶ 52}** "A. That's a lie.

**{¶ 53}** "Q. It's a lie?

**{¶ 54}** "A. It's a lie.

**{¶ 55}** "Q. It's a lie that you shot someone?

**{¶ 56}** "A. No.   It's a lie —

**{¶ 57}** "[DEFENSE COUNSEL] Objection, Your Honor.

**{¶ 58}** "THE COURT: Wait a minute, just a minute.   That objection will be sustained.   The jury will disregard that comment.

**{¶ 59}** "Q. The felonious assault that you spoke of with [defense counsel], you left off the part that *** was with a gun?

**{¶ 60}** "A. Yes.

**{¶ 61}** "Q. Isn't it true that was felonious assault with gun specifications?

**{¶ 62}** "A. Uh-huh."

**{¶ 63}** The state is allowed to inquire into the defendant's prior criminal record in order to attack his credibility under Evid.R. 609, so long as the probative value outweighs the danger of unfair prejudice.

**{¶ 64}** Evid.R. 609 governs the procedure for impeachment with evidence of convictions.   Evid.R. 609(A)(2) provides:

**{¶ 65}** "Evidence that the accused has been convicted of a crime is admissible if the crime was punishable by death or imprisonment in excess of one year pursuant to the law under which the accused was convicted and if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

**{¶ 66}** We find the prosecutor's questions regarding whether he was convicted of felonious assault with a gun specification to be proper. But the prosecutor's commentary within his question that Benitez was a "bad guy who shot someone" was improper.

**{¶ 67}** Despite the prosecutor's few instances of improper conduct, we may not reverse Benitez's convictions unless the prosecutor's improper conduct deprived him of a fair trial. *State v. Fears*, 86 Ohio St.3d 329, 332, 1999-Ohio-111, 715 N.E.2d 136. A trial should not be deemed "unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments." *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶181.

**{¶ 68}** In this case, we find the prosecutor's misconduct to be minor when looking at the record as a whole. A.F.'s testimony was clear and detailed as to what happened to her. Fallon and the sexual assault nurse corroborated what A.F. had told them about the sexual abuse. And what A.F. told them was nearly identical to what she testified to in

court. Thus, looking at the entire record, we conclude that Benitez was not deprived of a fair trial.

{¶ 69} Benitez's first assignment of error is overruled.

### Other-Acts Evidence

{¶ 70} Benitez complains that the trial court erred in allowing the prosecutor "to inquire into evidence that the defendant-appellant committed other crimes, wrongs, or acts independent of the offense." He claims that it was improper for the state to elicit evidence that he was "beating the children [or] shooting anyone."

{¶ 71} The standard of review regarding the admissibility of any such evidence is abuse of discretion. *State v. Sanford*, 8th Dist. No. 84478, 2005-Ohio-1009, ¶10, citing *State v. Montgomery* (1991), 61 Ohio St.3d 410, 575 N.E.2d 167.

{¶ 72} Evid.R. 404(B) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The listed exceptions within Evid.R. 404(B) are not exclusive, and other acts evidence not fitting within the enumerated categories may be admissible so long as the evidence is admitted for any proper purpose other than proving the defendant's propensity to act and conformity with a particular trait of his character. *State v. Smith* (1990), 49 Ohio St.3d 137, 140, 551 N.E.2d 190.

{¶ 73} Evidence that Benitez beat the children and shot someone is certainly other-acts evidence with no admissible purpose. But we find no error here on the part of the trial court. With respect to allowing evidence of Benitez "beating the children," Benitez opened the door to this evidence during his cross-examination of A.F. Further, the trial court did not err in allowing the state to question Benitez about "beating the children" after Benitez, during his direct-examination, denied that he spanked the children. This question was permissible to rebut his assertion.

{¶ 74} As for evidence that Benitez shot someone, the trial court sustained Benitez's objection regarding that evidence when the state asked him if he shot someone. And A.F.'s testimony that she was afraid to tell anyone about the sexual abuse because Benitez had *told her* he shot someone is not other-acts evidence. It is direct evidence of the victim's fear and state of mind.

{¶ 75} Benitez further argues that the trial court erred by not instructing the jury as to the limited purpose of other-acts evidence pursuant to R.C. 2945.59. But as we reviewed above, the trial court was not required to give a limiting instruction because the other-acts evidence that did come in did so because Benitez opened the door to it.

{¶ 76} Accordingly, we overrule Benitez's second assignment of error.

<u>Right of Defendant to Call Witnesses</u>

**{¶ 77}** In his third assignment of error, Benitez maintains that the trial court erred when it refused to allow him to call two witnesses in his defense that had testified in the state's case-in-chief; Selena and A.U. (A.F.'s older brother).

**{¶ 78}** Prior to the state resting, Benitez informed the court that he intended to call Selena and A.U. to testify on his behalf. The prosecutor objected. The trial court inquired as to why Benitez wanted to call these witnesses when they already testified.

**{¶ 79}** Evid.R. 611(A) provides that a trial court "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." It is within the trial court's discretion as to how evidence should be presented. *State v. Gutierrez,* 3d Dist. No. 5-10-14, 2011-Ohio-3126, ¶101.

**{¶ 80}** The trial court allowed Benitez's defense counsel to explain why he wanted to "call them back" to testify. Defense counsel stated that he wanted to call A.U. back to testify about an "incident" that took place after A.U. testified. Defense counsel explained that he wanted A.U. to testify to what occurred as he was leaving the court after he testified. Defense counsel said that as A.U. was leaving, "the family would not even look at him, wouldn't talk to him, and he had felt pressure throughout." And also, that A.U. would "rebut some of the things that were said on the — the little girl said that she didn't watch certain television in Cleveland."

{¶ 81} The trial court denied Benitez's defense counsel request to call A.U. on Benitez's behalf because what happened with his family after he testified was a collateral issue that did not merit bringing a "young man" who was "emotionally upset" and making him "go through this all over again."

{¶ 82} As for Selena, Benitez's defense counsel explained that "there's some things I should have asked her more directly, and I wanted to clarify that on my case in chief." When asked what he meant by that, defense counsel further explained that Selena would testify that A.F. did watch "the television program on a regular basis." The trial court denied Benitez's defense counsel's request because Selena "had a full and complete examination."

{¶ 83} After reviewing the record, we cannot say that the trial court abused its discretion when it refused to allow Benitez to call Selena and A.U. on his behalf. Benitez's defense counsel extensively cross-examined nearly every witness, as well as the three witnesses who testified for Benitez *and* Benitez himself, regarding when A.F. first watched Law and Order Special Victims Unit — whether it was in Cleveland or Arizona — and how often she watched it. The jury was fully aware of Benitez's theory that A.F. made up the sexual abuse allegations after watching Law and Order too many times because she wanted to live with her "rich aunt" in Arizona.

{¶ 84} Benitez's third assignment of error is overruled.

Manifest Weight of the Evidence

{¶ 85} In his fourth assignment of error, Benitez claims that his convictions were against the manifest weight of the evidence. He claims the jury lost its way because A.F.'s testimony was "vague, uncertain, conflicting, fragmentary, and not fitting in a logical pattern." We disagree.

{¶ 86} In reviewing a claim challenging the manifest weight of the evidence, "[t]he question to be answered is whether there is *substantial* evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt. In conducting this review, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Internal quotes and citations omitted.) *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶81.

{¶ 87} We disagree with Benitez's contention regarding A.F.'s testimony. Not only do we find her testimony to be clear, concise, and direct, her "story" as to what Benitez did to her was consistent with respect to what she told everyone, including her aunt and the sexual assault nurse, both of whom testified.

{¶ 88} Accordingly, after reviewing the entire record, we conclude that this case is not the "exceptional case in which the evidence weighs heavily against the conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.

{¶ 89} Benitez's fourth assignment of error is overruled.

Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.   The defendant's conviction having been affirmed, any bail pending appeal is terminated.   Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, PRESIDING JUDGE

JAMES J. SWEENEY, J., and
LARRY A. JONES, J., CONCUR