[Cite as *State v. R.W.*, 2022-Ohio-2771.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 110858 |
| v. | : | |
| R.W., SR., | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 11, 2022

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-641796-A

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Debora Brewer and Melissa Riley, Assistant Prosecuting Attorneys, *for appellee.*

Tim Young, Ohio State Public Defender, and Craig M. Jaquith, Assistant State Public Defender, *for appellant.*

KATHLEEN ANN KEOUGH, P.J.:

{¶ 1} Defendant-appellant, R.W., Sr., appeals his convictions and sentence following a jury trial. For the reasons that follow, we affirm.[1]

## I. Procedural Background

{¶ 2} In July 2019, appellant was named in an eight-count indictment charging him with rape, a first-degree felony violation of R.C. 2907.02(A)(2) (Count 1); rape, a first-degree felony violation of R.C. 2907.02(A)(1)(c) (Count 2); rape, a first-degree felony violation of R.C. 2907.02(A)(2) (Count 3); rape, a first-degree felony violation of R.C. 2907.02(A)(1)(c) (Count 4); burglary, a second-degree felony violation of R.C. 2911.12(A)(1) (Count 5); and sexual battery, a third-degree felony violation of R.C. 2907.03(A)(5) (Count 6); retaliation, a third-degree felony violation of R.C. 2921.05(B) (Count 7); and intimidation of a crime victim or witness, a first-degree misdemeanor violation of R.C. 2921.04(A) (Count 8). Appellant pleaded not guilty, and the trial court assigned him counsel.

{¶ 3} Early in the pretrial stages of the case, appellant asserted his desire to represent himself. As such, he was referred to the court's psychiatric clinic for a competency evaluation. The competency report concluded that appellant was both competent to stand trial and proceed without counsel. After extensive inquiry by two different judges and several refusals to proceed with certain attorneys acting as standby counsel, he executed the necessary documentation waiving counsel. On

---

[1] Pursuant to Loc.App.R. 13.2(c) and (d) of the Eighth District Court of Appeals, this court uses the initials of the appellant because using his actual name is likely to reveal the identity of the juvenile sexual-assault victim and other juvenile witnesses.

July 19, 2021, appellant, pro se, commenced a jury trial before a retired judge sitting by assignment, with his approved stand-by counsel.

## II. Jury Trial

{¶ 4} The state's first witness was the victim, appellant's then 15-year-old daughter ("the victim"). She stated that in 2019 she lived with her mother, sister, brother, her father's girlfriend, and her father (appellant). She stated that she slept in the basement and on occasion appellant would sleep in the bed with her. During the night of May 13-14, 2019, while her mother was hospitalized following a stroke, the victim awoke in her bed to her appellant on top of her, "grinding" on her. She stated that her pants were pulled down and she was laying on her stomach. She felt him reach under her and touch her vagina. The victim testified that appellant then put his penis in her vagina. She stated that it hurt and she did not know how long the assault went on, but when he stopped, he got a rag, cleaned both of them up, and went upstairs. She told the jury that after the assault she sat in bed crying, trying to go back to sleep.

{¶ 5} The victim stated that she got up and appellant took her and her siblings to school that morning. She stated that she disclosed the sexual assault to a friend of hers at recess, who in turn told the assistant principal. After this disclosure, she stated that she was taken to the hospital for an examination and spoke to the police, an investigator, and a counselor about the sexual assault.

{¶ 6} The victim testified that this incident was not the only time appellant assaulted her in her bedroom. She told the jury about another incident that occurred

in February 2019, when she awoke to appellant putting his penis in her vagina. On cross-examination, she stated that this other incident occurred in April 2019. The victim testified that she eventually told her younger sister about what their father did, but they kept it a secret.

{¶ 7} On cross-examination, the victim admitted that appellant set rules and expectations for her and her younger sister, concerning chores, cellphone usage, what music they listened to, and with whom they socialized. Appellant often used the word "controlling" and "disciplinarian" when questioning the victim about living with appellant. The victim admitted that appellant's expectations were in contrast to her mother's approach on parenting. She agreed that she "didn't appreciate [appellant's] controlling ways," and that she "liked things a lot better how they were before [appellant] came into [her] life." (Tr. 587.) She testified that at the time of sexual assault, she had only lived with appellant since late 2018, but prior to that only "off and on for a total of 15 months." (Tr. 584.)

{¶ 8} The victim stated that after the allegations, appellant no longer lived with them and was not permitted to be at the home. However, during the late-night hours of June 20, 2019, the victim discovered appellant in their home. She stated that she called the police — the 911 recording was played for the jury. During the recording, the victim tells the operator that appellant was not supposed to be at the home because appellant "molested" her. She testified that during this incident, appellant approached her, questioning why she was "lying on him." She stated he made her feel scared and afraid he was going to hurt her. In fact, when appellant

asked her how he had hurt her, the victim responded, "he's left me with trauma." (Tr. 644.)

{¶ 9} Twyla West testified she was the assistant principal at Adlai Stevenson school back in 2018. She recalled the victim appearing in her office with another student on May 14, 2019, and informing her that the victim was sexually assaulted by appellant. According to West, the victim appeared very distraught, upset, and was crying as she described what occurred earlier that day. She stated after speaking with the victim, she contacted the Cuyahoga County Division of Children and Family Services ("CCDCFS") and the police, who later transported the victim to the hospital.

{¶ 10} Michael Bokmiller, a social worker with CCDCFS, testified as to his investigation into the sexual abuse allegation. Bokmiller testified he reported to Adlai Stevenson school and met with the victim who advised him what had occurred. He also spoke with appellant, who denied the allegations, attributing them to the fact that he had recently taken his daughters' cell phones from them. He also testified that he performed forensic interviews at the Child Advocacy Center of both the victim and her younger sister. Based on his investigation, he deemed the allegations "substantiated" and recommended that the victim and her family seek counseling.

{¶ 11} Kate Burns, a Sexual Assault Nurse Examiner ("SANE") with University Hospitals, testified that she treated the victim and performed the Sexual Assault examination. She testified that she collected samples for DNA analysis, and

although the clothing the victim wore during the assault was not obtained, she retained the underwear that the victim wore to the hospital. Burnes indicated upon her physical exam she found some redness on the lower part of the victim's hymen, but otherwise her examination did not reveal any other abnormalities.

{¶ 12} BCI forensic analysts, Andrew Sawin and Hallie Dreyer, testified that they tested the items from the victim's rape kit. Sawin testified that the standard DNA testing of the anal and vaginal swabs did not indicate a DNA profile foreign to the victim's profile. Testing from the victim's underwear revealed an unidentifiable minor profile that could be attributed to a male. Sawin testified that the presence of this minor profile could have occurred during laundry or other household transfers.

{¶ 13} Dreyer testified that she analyzed the Y-STR testing, which solely focuses on the presence of male DNA. She stated that the testing confirmed the presence of male DNA. Regarding the vaginal and anal swabs, the male profile was of insufficient quality to include or exclude appellant as the contributor. However, appellant was specifically excluded as the contributor to the male DNA profile found on the swab taken from the victim's buttocks.

{¶ 14} The victim's younger sister, who was 14-years old at the time of trial, testified that on an unspecified date, she was sleeping in bed with the victim and appellant, who is also her father. She recalled that movement in the bed caused her to wake. She testified that she saw her father "shaking" himself on top of the victim with his pants down. She stated that her sister appeared to be sleeping, and appellant was a few inches on top of her sister. She testified that she asked her father

to "stop" and then asked him if she could sleep next to her sister. She stated that she was unsure what occurred but it made her feel uncomfortable. She testified that her sister later told her about the sexual assaults, but that she kept it a secret.

{¶ 15} On cross-examination, the younger sister admitted that appellant was controlling, but denied fabricating the allegations or being untruthful. She denied that the movement in the bed was merely appellant's habit of shaking his legs when trying to get comfortable. Additionally, she denied that appellant ever touched her inappropriately and admitted that if appellant had not moved in with them, "none of this would be happening right now." (Tr. 779.)

{¶ 16} Ashley Martinez testified she is a licensed counselor at Frontline Services. She stated that the victim was referred to her for treatment by CCDCFS. Martinez stated that during the victim's assessment, she learned there had been an alleged sexual assault and molestation alleged involving the victim's father. She stated that the victim reported symptoms regarding distress, stomach aches, hypervigilance, and sleeping with a knife in her bed. Martinez testified that after evaluating the victim, she made a diagnosis stating that the victim had symptoms consistent with post-traumatic stress disorder ("PTSD") as "a result of the sexual assaults."

{¶ 17} The victim's mother testified that she is also the mother of the victim's younger sister. She stated that she moved into a house with her children and appellant in late 2018. She testified that the appellant would often sleep in the basement with the victim, which she found odd. Mother stated that in May 2019,

while hospitalized from a stroke, she received a call from a school official reporting that her daughter had reported being sexually assaulted by the appellant.

{¶ 18} Mother also testified as to her relationship with appellant and about appellant's relationship with the victim. She described to the jury appellant's controlling behavior both with her and their children. It was revealed during her testimony that appellant had a criminal history, which included prostitution and that he was a registered sex offender. As for appellant and the victim's relationship, she stated that appellant always favored the victim and treated her differently from the other children. She denied coaching or encouraging her daughters to lie or fabricate these allegations.

{¶ 19} Appellant elected not to testify, and attempted to call four witnesses. He tried to call the victim's mother, as a defense witness, after she had testified as a state's witness. The trial court, however, did not allow him to call her as witness finding that she previously testified and was subject to extensive cross-examination.

{¶ 20} Appellant's first witness was Maple Heights Police Officer Derek Jividen, who testified regarding a notation that he had made that indicated that preliminary DNA testing by BCI showed "[n]o DNA profile foreign to [the victim.]." The second defense witness was appellant's granddaughter, who testified that appellant had been like a father to her and that she had never known him to abuse children. And the final defense witness, Brittani Troyer, a forensic analyst at BCI, testified regarding a lab report that reflected that DNA testing showed that the results were inconclusive on the vaginal samples and anal samples, but that

appellant was excluded as being a possible contributor to male DNA profile discovered on the victim's buttocks swabs.

{¶ 21} The jury found appellant not guilty of Counts 1 and 2, but guilty of the remaining counts. The trial court concluded that Counts 3 and 4, and Counts 7 and 8 were allied offenses; the state elected that the court sentence appellant on Counts 3 and 7. Over objection, the trial court imposed a prison term under the Reagan Tokes Law of eight to twelve years on Count 3, 6 years on Count 5, four years on Count 6, and to time served on Count 7. All counts were ordered consecutive to each other for a total prison sentence of 18 to 22 years.

{¶ 22} Appellant now appeals, raising seven assignments of error.

## III. The Appeal

### A. Jail Clothing

{¶ 23} In his first assignment of error, appellant contends that the trial court erred when it allowed the jurors to view him in orange jail clothing for one full day during the trial, which included the pro se presentation of his closing argument. Under this assignment of error, he raises two issues — (1) whether the trial court made a reasonable effort to ensure that he did not appear before the jury dressed in orange jail clothing; and (2) whether the trial court and the state engaged in ex parte communication regarding appellant's appearance at trial in orange jail clothing. He claims that his appearance in jail clothing creates reasonable doubt whether the jurors were able to deliberate objectively and fairly.

### 1. Appearance in Jail Clothing

{¶ 24} The United States Supreme Court has held that a defendant's right to due process may be violated where the defendant stands trial before a jury while dressed in identifiable jail clothes. *Estelle v. Williams*, 425 U.S. 501, 504, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). The court recognized that "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment." *Id.* at 504; *see also Holbrook v. Flynn*, 475 U.S. 560, 568, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986). The court, however, declined to establish a bright-line rule requiring a conviction to be reversed where the defendant appeared before the jury in jail clothing, recognizing that a defendant might choose to wear identifiable jail clothing "in the hope of eliciting sympathy from the jury." *Estelle* at 507-508.

{¶ 25} To establish that a constitutional violation occurred, the defendant must show that she or he was compelled to stand trial before a jury while dressed in identifiable jail clothing. *State v. Trowbridge*, 1st Dist. Hamilton No. C-110541, 2013-Ohio-1749, ¶ 28. Even if such showing is made, the defendant must still demonstrate that he was prejudiced by such compulsion. In *State v. Grissom*, 6th Dist. Erie No. E-99-029, 2000 Ohio App. LEXIS 4977 (Oct. 27, 2000), the defendant claimed that his appearance in jail clothing prejudiced him. The Sixth District observed that the jury did not convict appellant of all the charges against him, which indicated that the jury "carefully considered the evidence relating to the charges rather than making a blanket decision that appellant was guilty because he was

dressed in jail clothing at trial." *Id.* at 8. Following *Grissom*, this court concluded that a jury's decision not to convict a defendant of all charges indicates the jury carefully reviewed the evidence presented and that a brief appearance in prison clothing did not bias the jury. *State v. Hawthorne*, 8th Dist. Cuyahoga No. 102689, 2016-Ohio-203, ¶ 30.

{¶ 26} In this case, appellant appeared in civilian clothing during the first five days of trial. On the morning of the July 26, 2021, the fifth day of trial, appellant expressed his discomfort with the restraints around his ankles. He made these statements in front of the jury and revealed to the jury that his ankles were shackled.

> [APPELLANT]: Your Honor, these things hurt my feet. These are hurting my feet. They're too tight. (*Indicating*.)
>
> THE COURT: The jury will disregard that showing he just put on. Thank you.
>
> [APPELLANT]: And *I have had them on all week*, so * * *.

Emphasis added. (Tr. 1213.)

{¶ 27} Later that day, appellant collapsed in front of the jury during his examination of his witness. EMS was called and transported him to the hospital. Trial was postponed until the following day.

{¶ 28} The next day, appellant appeared in court seated in a wheelchair and wearing jail clothing. Outside the presence of the jury, the prosecutor stated that earlier that day, appellant refused to get off the floor in the jail medical area to take Ibuprofen and change his clothing. The prosecutor stated that appellant would not come into the courtroom, so they placed him in restraints. The trial court noted that

appellant was not currently in restraints, but handcuffed while seated in a wheelchair. The state asked the court to make a finding that him appearing in jail clothing and seated at counsel table was the least restrictive approach to allow the parties to proceed with trial.

{¶ 29} Appellant disagreed with the state's assessment, stating that he was in extreme pain and that he "did not refuse to dress in my clothes. They didn't try to dress me in any clothing. They put these oranges on me, and I don't want the jury to see me in these oranges." (Tr. 1248-1249.)

{¶ 30} Trial reconvened. In the presence of the jury, appellant stated "[t]his is inhumane to be treated this way. (Defendant moaning)." (Tr. 1251.) The trial court then advised the jury to "understand that you are not to draw any conclusions because of the attire of the Defendant here. So, that's it." (Tr. at *id*.) The record reflects that appellant continued making statements about his medical condition, claiming that he was in extreme pain and he was refused medical assistance and medication. According to appellant, he could not continue with his direct examination of his granddaughter due to his condition.

{¶ 31} We find that appellant was not denied his right to due process by appearing in jail clothing because no prejudice has been shown. First, the judge told the jurors to disregard the fact that appellant was shackled and wearing jail clothing, and we must presume that the jurors followed the instruction. *See State v. Dalmida*, 1st Dist. Hamilton No. C-140517, 2015-Ohio-4995, ¶ 21, citing *State v. Fears*, 86

Ohio St.3d 329, 334, 715 N.E.2d 136 (1999) (jury is presumed to follow court's instruction to disregard defendant's appearance in jail clothing).

{¶ 32} Moreover, our review of the record reveals that the trial court made every effort at the beginning of trial to ensure that the jury was unaware that appellant was being held in jail during trial. These efforts included skirting around counsel table to prevent the jury from seeing him shackled, the positioning of the table, appellant appearing in civilian clothing, and side bars being conducted at defense table. Despite these efforts, appellant, himself, revealed to the jury on the fifth day of trial that he was in custody through his own conduct by showing the jury the shackles on his feet and making statement that the shackles had been on his feet "all week." Accordingly, the fact that he appeared in jail clothing the following day after making such display and being taken to the hospital by EMS would not have surprised the jury to the point where it may have prejudiced appellant.

{¶ 33} This conclusion that the jury was not prejudiced is supported by the jury's verdict that found appellant not guilty of two counts of rape. Following *Hawthorne*, the fact that the jury did not convict appellant of all charges indicates that the jurors were clearly able to deliberate objectively and fairly. Accordingly, we find that appellant has failed to demonstrate how he was prejudiced by his appearance in jail clothing on the fifth day of trial.

### 2. Ex Parte Communication about Jail Clothing

{¶ 34} After trial resumed, the state cross-examined appellant's granddaughter. The record reveals that during this cross-examination, appellant

repeatedly objected to the state's questioning, implored his granddaughter to "plead the fifth," and interjected his own opinion or answers to the questions. The trial court cautioned appellant that if his disruptions continued, the court would proceed without the appellant's presence in the courtroom. Following this discussion, appellant requested a bathroom break; the court took a recess. During the recess and outside the presence of appellant, the court made a record of what occurred earlier that day:

> THE COURT: Let the record show the Defendant is not in the room here. He is in his orange jumpsuit, so-to-speak, and I did tell the jury to not draw any conclusions on the guilt or innocence because of that. The reason we had him brought up today in the wheelchair was because we've been told by the sheriff's deputies in the medical outfit that he refused any treatment this morning and he was laying on the floor, or lying on the floor I should say, and therefore we had him brought over because he wasn't — he refused the treatment. He refused to change, things like that. Anything else you want to add?
>
> [THE PROSECUTOR]: I would just ask, Your Honor, that the record reflect and that you adopt the findings that you had to order him brought over in a wheelchair with the handcuffs on because it was the only way to get him up. He refused to come up. That this is the least restrictive setting, or way to have him in the courtroom so that he can represent himself. And that this is — there's no other alternatives, so that we can proceed in court.
>
> THE COURT: There are no other alternatives. And also, let the record show that during all of the testimony of [his granddaughter], he was moaning and groaning quite a bit. And I did tell him on the record that if he continued to act out that we would just put him in the lockup and have him available by some audio ways, and apparently they're getting to that.
>
> * * *
>
> So that can be done, but I don't want to do that if we don't have to. If he runs out of witnesses, he will have rested his case and we will proceed to final argument. And as I already mentioned, there is one

hour for each party. And how he's going to give his final argument, I do not know, he says he's in a lot of pain; however, in my opinion it's somewhat convenient for him.

[THE PROSECUTOR]: And I would place on the record, Your Honor, that certainly when he was objecting to the information about Mr. Bokmiller, that suddenly the moaning stopped, only to start up again when the jury walked in the room.

THE COURT: All right.

(Tr. 1259-1261.)

{¶ 35} Appellant contends that the trial court violated his due process rights because it engaged in ex parte communication with the state regarding appellant's appearance in jail clothing. In support, he cites to Jud.Cond.R. 2.9(B) and *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168.

{¶ 36} Jud.Cond.R. 2.9(A) provides that "[a] judge shall not initiate, receive, permit, or consider communications made to the judge outside the presence of the parties or their representatives concerning a pending or impending proceeding * * *." Subsection (B) states that "[i]f a judge receives an unauthorized ex parte communication bearing upon the substance of a matter, the judge shall make provision promptly to notify the parties of the substance of the communication and provide the parties with an opportunity to respond."

{¶ 37} In *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, the Ohio Supreme Court relied on these rules of judicial conduct when it found that the trial court, on an ex parte basis, improperly elicited the state's assistance in drafting its judicial opinion imposing the death penalty. The court held that this ex

parte communication violated Roberts's right to due process and thus, reversed Roberts's death sentence.

{¶ 38} We find that *Roberts* is clearly distinguishable because in that case, the trial judge was the "final arbiter of justice" in making this ultimate decision on whether to impose the death sentence. *Id.* at ¶ 160. "The trial judge is charged by statute with the sole responsibility of personally preparing the [death-sentence] opinion setting forth the assessment and weight of the evidence, the aggravating circumstances of the murder, and any relevant mitigating factors prior to determining what penalty should be imposed." *Id.* at ¶ 159. Accordingly, the Supreme Court found that the trial judge's ex parte communication with the prosecutor seeking assistance in drafting the opinion making such final determination clearly undermined the confidence of the judicial process and was contrary to law. *Id.* at ¶ 159-163.

{¶ 39} In this case, the jury was the ultimate trier of fact and the communication between the prosecutor and the trial judge occurred outside the presence of the jury. Moreover, the communication between the trial judge and the state merely reiterated what was already placed on the record when appellant was present in the courtroom. Finally, as discussed above, the nature of the communication — that appellant's appearance in jail clothing was the least restrictive alternative — did not affect the jury's ability to consider the evidence without being influenced by appellant's courtroom attire. Accordingly, unlike the egregious conduct in *Roberts*, we find that the communication here did not

prejudice appellant or undermine the confidence in the judicial process in this case. We make this finding not without recognizing that the better practice would be for the trial court to conduct all conversations in the presence of the appellant, especially one that is acting as his own counsel.

{¶ 40} Appellant's prior conduct already alerted the jury to the fact that he may be held in jail during trial. Additionally, the record demonstrates that the jury carefully considered the evidence when it found appellant not guilty of two counts of rape. Finally, the trial court instructed the jury not to consider appellant's appearance in jail clothing as an indication of guilt. Accordingly, we find no error and the first assignment of error is overruled.

## B. Defense Witness

{¶ 41} The state called the victim's mother as a witness in its case-in-chief, and the record reflects that appellant extensively cross-examined her. In fact, the record reflects that mother testified for an entire day of trial — her testimony began the afternoon session of court on July 21, 2021, and concluded the following day.

{¶ 42} After the state rested its case, appellant attempted to call the victim's mother as his first witness. In the presence of the jury, the trial court advised appellant that despite him subpoenaing her, the court was not allowing him to call mother as a witness. The trial court explained that mother testified "for two days. You can't question her again. You cross-examined her. She's not going to testify." (Tr. 1207.) Appellant objected and questioned whether the trial court was prohibiting him from calling any witness who previously testified. The trial court

responded that it "was not saying that" but reminded appellant that all of his intended witnesses had to appear in court either "today or tomorrow morning."

{¶ 43} In his second assignment of error, appellant contends that the trial court erred when it prevented him from calling the victim's mother as a defense witness and limited his examination of mother to solely cross-examining her as a state's witness. He claims that this error denied him this right to present a complete defense as to "whether and what extent [his daughters] resented appellant's tendency toward being a disciplinarian."

{¶ 44} Evid.R. 611(A) provides that a trial court "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." It is within the trial court's discretion as to how evidence should be presented. *State v. Benitez*, 8th Dist. Cuyahoga No. 96257, 2011-Ohio-5498, ¶ 79, citing *State v. Gutierrez*, 3d Dist. Hancock No. 5-10-14, 2011-Ohio-3126, ¶101. Additionally, Evid.R. 403 allows the trial court to exercise discretion in the presentation of cumulative evidence or evidence that causes undue delay. The trial court has broad discretion in the admission and exclusion of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere. *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967).

{¶ 45} We note that appellant did not explain to the trial court why he wanted to call the victim's mother back to the witness stand in his defense. It is basic to appellate practice that error, in the form of excluded testimony, is not reviewable unless there has been a proffer of the excluded testimony or the content of such testimony is apparent from the circumstances. *Balliett v. Horan*, 5th Dist. Ashland No. 97 COA 01204, 1998 Ohio App. LEXIS 3540, 11-12 (July 27, 1998), citing Evid.R. 103. A review of the record demonstrates appellant made no proffer of the content of the victim's mother's testimony or what testimony he attempted to elicit that was beyond what she already provided. Although the record reveals that the trial court required appellant to immediately continue with his case-in-chief, appellant could have submitted a proffer outside the presence of the jury at the end of the day, or a proffer could have been made in written form filed with the trial court. *See Balliett* at *id.* Here, appellant did not avail himself to either option and even on appeal, he fails to disclose what specific testimony he hoped to elicit from the victim's mother that was not cumulative or redundant of what she had already testified to during appellant's extensive cross-examination.

{¶ 46} In *Benitez*, 8th Dist. Cuyahoga No. 96257, 2011-Ohio-5498, this court considered a similar issue of whether the trial court abused its discretion when it refused to allow Benitez to call two witnesses in his defense that had previously testified in the state's case-in-chief. Defense counsel explained to the court that the witnesses were needed in rebuttal and to clarify previous testimony. The trial court denied counsel's requested finding that the justification touched on a "collateral

issue" and did not justify the one witness rehashing her prior testimony and the other witness was subject to "full and complete examination." *Id.* at ¶ 82. This court found that the trial court did not abuse its discretion because the witnesses were extensively cross-examined and the jury was aware of the defense's theory that the sexual abuse allegations were fabricated. *Id.* at ¶ 83.

{¶ 47} We find this court's decision in *Benitez* persuasive. Here, the record reflects that mother was subject to extensive cross-examination about the allegations of sexual abuse by the victim. Much like in *Benitez*, appellant's theory of the case was that the victim invented the allegations because she resented him and his disciplinarian behaviors and that mother encouraged her behavior. The record reveals that this theory was expressed during appellant's opening statement and fully developed in the victim's testimony, the sister's testimony, and in mother's testimony during the state's case-in-chief. *See, e.g.*, tr. 546; 587-588; 755-756; 765; 999. Allowing appellant to call the victim's mother as a witness in his case-in-chief to reiterate this theory would have been cumulative and caused unnecessary delay.

{¶ 48} Accordingly, we find that the trial court did not abuse its discretion when it denied appellant's request to recall a witness who previously testified during the state's case-in-chief and was subject to extensive cross-examination. His second assignment of error is overruled.

## C. Expert Vouching for Credibility

{¶ 49} Martinez, a licensed professional counselor, testified about her interactions with the victim and family following a referral from CCDCFS. She was

not presented, qualified, or received as an expert. During the state's examination of Martinez, the prosecutor questioned her regarding her assessment of the victim to determine if any diagnosis exists, and any treatment recommendations she had made based on that diagnosis. Martinez testified that based on the information given, she "compile[s] everything into the assessment and then talk[s] with parent and child, about, you know, treatment recommendations, and in this case I made a recommendation for trauma focused kind of behavioral therapy." (Tr. 795-796.) She testified that she diagnosed the victim with "posttraumatic stress disorder" as "a result of the sexual assaults * * * or abuse." (Tr. 796.) Appellant did not object.

{¶ 50} Appellant contends in his third assignment of error that the trial court erred when it allowed testimony from a state's expert witness vouching for the credibility of the accusing witness. He contends that this error violated the Ohio Supreme Court's decision in *State v. Boston*, 46 Ohio St.3d 108, 545 N.E.2d 1220 (1989), that prohibits an expert or lay person circumventing the factfinder's role of assessing the credibility and veracity of witnesses.

{¶ 51} Because appellant did not object, we review this assignment of error under a plain error standard of review. Crim.R. 52(B) Under Crim.R. 52(B), plain errors affecting substantial rights may be noticed by an appellate court even though they were not brought to the attention of the trial court. To constitute plain error, there must be (1) an error, i.e., a deviation from a legal rule, (2) that is plain or obvious, and (3) that affected substantial rights, i.e., affected the outcome of the trial. *State v. Barnes*, 94 Ohio St. 3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. Even

if the error satisfies these prongs, appellate courts are not required to correct the error. *Id.*, citing Crim.R. 52(B). Appellate courts retain discretion to correct plain errors. *Id.* Courts are to notice plain error under Crim.R. 52(B), "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Id.*, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978).

{¶ 52} An expert may not testify as to the expert's opinion about the veracity of the statements of a child victim. *Boston* at 129. Such testimony is presumptively prejudicial and inadmissible because it "'infringe[s] upon the role of the fact finder, who is charged with making determinations of veracity and credibility.'" *Id.* at 128-129, quoting *State v. Eastham*, 39 Ohio St.3d 307, 312, 530 N.E.2d 409 (1988) (Brown, J., concurring). This court has implied, however, that "'*Boston* does not apply when the child victim actually testifies and is subjected to cross-examination.'" *State v. Djuric*, 8th Dist. Cuyahoga No. 87745, 2007-Ohio-413, ¶ 44, quoting; *State v. Benjamin*, 8th Dist. Cuyahoga No. 87364, 2006-Ohio-5330, ¶ 19. In this case, the victim testified and was subject to cross-examination where she stated that appellant sexually assaulted her on two different occasions. Additionally, when appellant asked her how he had hurt her, the victim responded, "he's left me with trauma." (Tr. 644.)

{¶ 53} More importantly, however, Martinez did not testify whether she believed the victim or whether the victim was being truthful. Rather, she explained to the jury her interactions with the victim, her assessment of the victim, her

diagnosis, and treatment options. She stated that the symptoms that the victim reported satisfied the criteria for post-traumatic stress disorder, which was a result of the sexual assaults that the victim reported. Martinez did not opine that these allegations were truthful or credible. Accordingly, *Boston* does not apply.

{¶ 54} Based on the foregoing, we find no obvious error that affected the substantial rights of appellant that would require this court to make a finding of plain error. The third assignment of error is overruled.

### D. Jury Instructions

{¶ 55} Appellant contends in his fourth assignment of error that the trial court erred when it instructed the jury that they could "consider prior criminal activity in considering the guilt or innocence of the accused."

{¶ 56} After all parties rested, the trial court provided the jury its instructions for deliberation. Following the instructions, the trial court asked the parties if any additions or deletions were requested. The prosecutor asked about its Evid.R. 404(A) proposed instruction that allowed the state to rebut the appellant's character and reputation evidence. The trial court then stated:

> THE COURT: I did talk about prior criminal activity.
>
> [THE PROSECUTOR]: And I think we had submitted a 404(A) proposed instruction to the Court and to the Defendant just talking about the fact that information has been offered with regards to the Defendant's reputation, the State is allowed to rebut that and that information will be used for reputation or rebuttal alone.
>
> THE COURT: Right. I think you can consider prior criminal acts. I certainly —
>
> [APPELLANT]: Say that again. Could you say that again.

> THE COURT: Yeah, you can consider prior criminal activity in considering the guilt or innocence of the accused.

(Tr. 1341-1342.)  The appellant did not object to the court's statement.

{¶ 57} Although the trial court made this statement to the parties in the presence of the jury, the verbal and written instructions provided to the jurors did not contain any such statement.  The trial court gave the jury a standard "other acts evidence" jury instruction:

> Now, evidence was received about the commission of crimes other than the offenses with which the Defendant is charged in this trial.  That evidence was received only for a limited purpose.  It was not received, and you should not consider it, to prove the character of the Defendant in order to show that he acted in conformity or in accordance with that character.
>
> If you find that the evidence of other crimes is true and the Defendant committed them, you may consider that evidence only for the purpose of deciding whether it proves: the absence of mistake or accident; or the Defendant's motive, opportunity, intent, and purpose, preparation, or plan to commit the offense charged in this trial; or knowledge of certain circumstances surrounding the offense charged in this trial; or the identity of the person who committed the offense in this trial.  That evidence cannot be considered as other acts or for any other purpose.

(Tr. 1325.)

{¶ 58} Generally, "[i]n examining errors in a jury instruction, a reviewing court must consider the jury charge as a whole and 'must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights.'" *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 115, quoting *Kokitka v. Ford Motor Co.*, 73 Ohio St.3d 89, 93, 652 N.E.2d 671 (1995), quoting *Becker v. Lake Cty. Mem. Hosp. W.*, 53 Ohio St.3d 202, 208, 560 N.E.2d 165 (1990).

{¶ 59} However, appellant did not object to the jury instructions given, so we review for a determination of whether the trial court committed plain error. *State v. Dickess*, 174 Ohio App.3d 658, 2008-Ohio-39, 884 N.E.2d 92, ¶ 31 (4th Dist.); *see also* Crim.R. 30(A). Plain error does not exist unless the defendant shows that the outcome of the trial clearly would have been different but for the alleged erroneous instruction. *Id.* at ¶ 32, citing *State v. Campbell*, 69 Ohio St.3d 38, 630 N.E.2d 339 (1994), and *Cleveland v. Buckley*, 67 Ohio App.3d 799, 588 N.E.2d 912 (8th Dist.1990).

{¶ 60} In this case, we find that the trial court gave the jury the proper instruction regarding evidence of other acts. We presume the jury followed those instructions. *See State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995); *Pang v. Minch*, 53 Ohio St.3d 186, 195, 559 N.E.2d 1313 (1990). And although the trial court directed a general statement to the parties about the consideration of other crimes when deciding guilt or innocence, the trial court did not include this instruction in its specific advisement or in the written form that was provided to the jury. Moreover, the jury's verdict clearly demonstrates that it was not prejudicially swayed by the appellant's prior criminal conduct. Accordingly, we find that the trial court did not commit plain error in making this broad statement to the parties. Appellant's fourth assignment of error is overruled.

### E. Cumulative Effect of Errors

{¶ 61} Appellant contends in his fifth assignment of error that the cumulative effect of trial-court errors denied him his right to a fair trial.

{¶ 62} Under the cumulative-error doctrine, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223. We have found no error. Thus, the doctrine of cumulative error does not apply to this case, and we overrule this assignment of error.

### F. Manifest Weight of the Evidence

{¶ 63} Appellant contends in his sixth assignment of error that the findings of guilt for Counts 3, 4, and 6 are against the manifest weight of the evidence. He does not challenge his convictions on Counts 5 (burglary) and 7 (intimidation). We initially note that Counts 3 and 4 were merged for sentencing with the state electing to impose sentence on Count 3. Accordingly, this court will only address Counts 3 and 6 under this assignment of error.[2]

{¶ 64} The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' * * *, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.'" *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), paragraph two of the syllabus.

---

[2] For the purposes of R.C. 2941.25, a conviction consists of a guilty verdict and the imposition of a sentence or penalty. Because Count 4 merged with Count 3 for sentencing, no conviction exists on Count 4, and therefore, we cannot individually review the evidence supporting that findings of guilt. *See, e.g., State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685. This rationale applies to both sufficiency and manifest weight challenges. *See State v. Worley*, 8th Dist. Cuyahoga No. 103105, 2016-Ohio-2722, ¶ 23; citing *State v. Powell*, 49 Ohio St.3d 255, 263, 552 N.E.2d 191 (1990)

{¶ 65} Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on its effect in inducing belief." *Eastley* at ¶ 12, quoting *Thompkins* at 387. In a manifest weight analysis, this court sits as a "thirteenth juror," and reviews "'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at *id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). The discretionary power to grant a new trial should be exercised only in exceptional cases where the evidence weighs heavily against the conviction. *Thompkins* at 386.

{¶ 66} Appellant was found guilty of Count 3, rape, in violation of R.C. 2907.02(A)(2). The indictment charged that on or about May 13, 2019, appellant engaged in sexual conduct to wit: vaginal intercourse, with [the victim] by purposely compelling her to submit by force or threat of force.

{¶ 67} Appellant was also found guilty of Count 6, sexual battery, in violation of R.C. 2907.03(A)(5). The indictment charged that on or about December 9, 2018, to May 13, 2019, Appellant engaged in "sexual conduct with [the victim] not his spouse, and [appellant] being the father of [the victim]."

{¶ 68} Appellant contends that his convictions are against the manifest weight of the evidence because the physical evidence from the Y-STR DNA testing

and the SANE nurse examination was inconclusive and uncertain. Specifically, he contends that although the state's expert testified about the presence of male-specific DNA on the victim's front and back panels of her underwear, the state's expert admitted that this DNA could have come from laundry or other household transfers. Additionally, appellant contends the evidence weighs against conviction because that the Y-STR male-specific profile from one of the swabs specifically excluded appellant as a contributor. Finally, he directs this court to the SANE nurse's testimony that the redness observed at the base of the victim's hymen could have been caused by events other than sexual assault.

{¶ 69} Although appellant identifies the evidence most favorable to him, the jury also heard testimony from the victim that after appellant sexually assaulted her, "he got off of me and then went to go get a rag and wipe me and clean me up." (Tr. 569, 607). Additionally, the victim testified that she showered after the assault and changed her clothing, including her underwear. Accordingly, while the physical evidence seems inconclusive or uncertain, the jury also heard testimony that would justify or explain the lack of physical evidence recovered in this case.

{¶ 70} Appellant also contends that his convictions are against the manifest weight of the evidence because the trial court improperly allowed the state's witness to improperly vouch for the credibility of the victim. We disagree. First, this court in addressing appellant's third assignment of error concluded that Martinez did not impugn the jury's role of assessing credibility. At no time did Martinez testify that

she found the victim truthful, her accusations credible, or that she believed the victim's allegations.

{¶ 71} While we consider the credibility of witnesses in a manifest weight challenge, we remain mindful that the determination regarding witness credibility rests primarily with the trier of fact who hears all the testimony and is in the best position to observe the witnesses at trial. *State v. Kilton*, 8th Dist. Cuyahoga No. 106864, 2019-Ohio-87, ¶ 20, citing *State v. Mossburg*, 8th Dist. Cuyahoga No. 98769, 2013-Ohio-1664, ¶ 22. In this case, the jury heard direct testimony from the victim surrounding the rape and sexual battery. Accordingly, the jury was in the best position to observe the victim's demeanor and make its own determination regarding the victim's credibility. Appellant does not direct this court to any inconsistencies in her testimony or any other witnesses whose testimony would render her testimony incredible.

{¶ 72} Accordingly, we find that the jury did not lose its way in convicting appellant of rape and sexual battery. This case is not the exceptional case where the evidence weighs heavily against the convictions. Accordingly, appellant's sixth assignment of error is overruled.

### G. Reagan Tokes

{¶ 73} In his seventh assignment of error, appellant contends that the trial court erred when it sentenced him to an indefinite sentence under the Reagan Tokes Law because the law violates constitutional guarantees of due process, the separation-of-powers doctrine, and the right to trial by jury.

**{¶ 74}** Based on the authority established by this district's en banc holding in *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.), the challenges appellant advances against the constitutional validity of the Reagan Tokes Law have been overruled. *Id*. at ¶ 17-54. Accordingly, his seventh assignment of error is summarily overruled.

**{¶ 75}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

KATHLEEN ANN KEOUGH, PRESIDING JUDGE

EILEEN A. GALLAGHER, J., and
LISA B. FORBES, J., CONCUR

N.B. Judge Lisa B. Forbes is constrained to apply *Delvallie*. For a full explanation, *see State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.). (Forbes, J., dissenting).